# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2762
_____

United States of America

*Plaintiff - Appellee*

v.

Dico, Inc.; Titan Tire Corporation

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: June 11, 2015
Filed: December 10, 2015

_____

Before LOKEN, BYE, and KELLY, Circuit Judges.

_____

BYE, Circuit Judge.

Dico, Inc. ("Dico") owned several buildings in Des Moines, Iowa, that were under an Environmental Protection Agency ("EPA") order regulating their use because of hazardous substance contamination. Without informing the EPA, Dico, through its corporate affiliate Titan Tire Corporation ("Titan Tire"), sold the buildings to Southern Iowa Mechanical ("SIM"), which tore them down and stored them in an

open field where Polychlorinated Biphenyls ("PCBs") were later found. The government brought this action against Dico to recover damages for its cleanup costs and alleged that Dico violated the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") by "arrang[ing] for disposal" of the PCBs in the buildings and also violated the EPA order governing use of the buildings. The district court found Dico liable for both violations, awarded response costs, civil penalties, and punitive damages. On appeal, Dico argues material issues of fact precluded summary judgment on the issues of liability and damages for both "arranger" liability under CERCLA and the EPA order violation. Dico also argues the district court erred in treating any alleged violation of the EPA order as a continuing offense. We reverse the district court's summary judgment order with respect to "arranger" liability under CERCLA and punitive damages but affirm the summary judgment order as to the EPA order violation and civil penalties.

I

In the mid-1970s, the EPA took interest in the Dico buildings at issue in this case because of the presence of trichloroethylene ("TCE") contamination in the groundwater around them. See generally United States v. Dico, Inc., 266 F.3d 864, 868 (8th Cir. 2001). The EPA required Dico to implement a groundwater extraction, treatment, and monitoring system. Later, the EPA also discovered pesticide and herbicide contamination in soils adjacent to several buildings in the area; specifically, Buildings 1 through 5 and the Maintenance Building. During the investigation for pesticides, the EPA discovered PCBs in the adhesive contained in the building insulation of all of the buildings except Building 1. Consistent with the findings in the environmental investigator's August 1992 report, the EPA issued an administrative order on March 4, 1994 ("EPA Order"), requiring Dico to remove some of the PCB contamination and to encapsulate all remaining insulation to prevent any further release of PCBs.

Dico and the EPA then agreed on an operation and maintenance plan to address the PCB contamination. Dico submitted a report in 1997 ("1997 Report"), indicating it had completed the required removal. In its report, Dico did not assert that it had removed all PCB contamination and the author of the report testified that he believed some PCBs remained after the removal action. The EPA approved the 1997 Report but reminded Dico of its continuing obligations under the EPA Order. The operation and maintenance plan required Dico to inspect and maintain the encapsulated surfaces inside the buildings covered by the EPA Order. By 2002, Dico no longer occupied or used the buildings and did not want to continue the required testing under the EPA Order and operation and maintenance plan. The EPA and Dico agreed to discontinue the required testing with the provision that Dico provide annual reports on whether the buildings were back in use, which would again trigger the responsibilities and obligations under the operation and maintenance plan.

In 2007, Dico, through Titan Tire, entered into three separate transactions with SIM: one for the disassembly and removal of the Maintenance Building; one for the western portion of Building 3; and one for the purchase of Buildings 4 and 5 and a northern portion of the Production Building. Dico paid $1.00 per square foot to acquire these buildings.[1] Dico's intent in selling the buildings—whether Dico intended to actually sell the buildings or merely wished to rid itself of the responsibilities associated with the PCBs contained in the buildings—was heavily disputed before the district court and is the central issue in this appeal. After purchasing the buildings, SIM dismantled them and disposed of all materials except for the steel beams.[2]

---

[1]Dico also sold SIM a Weld Shop Building, which was disassembled, moved to SIM's property, and reassembled there. Neither the Weld Shop Building nor the Production Building was subject to the EPA Order.

[2]Building 1, Building 2, the original section of Building 3, and the southern portion of the Production Building remained on the Dico property.

During a five-year inspection of the Dico site in September 2007, EPA Project Manager Mary Peterson observed that most of the buildings at issue were dismantled, and the EPA for the first time learned the buildings had been sold. The EPA sent a letter to Dico informing it that it will be responsible for any cleanup costs resulting from contamination associated with the disassembly of the buildings. The EPA then traced the steel beams to SIM's Ottumwa, Iowa, storage site, where it found them "in piles in a large open area, many in direct contact with the ground . . . and not protected from the elements," with visible insulation pieces attached. United States v. Dico, Inc., 892 F. Supp. 2d 1138, 1145 (S.D. Ia. 2012). After taking samples from the steel beam piles and the soil in the area, the EPA confirmed the presence of PCBs in some of the beams, the soil, and the insulation attached to the beams. Although the EPA was able to determine the steel beams came from the Dico buildings, it had no way of tracing the specific origin of the PCBs and could not confirm whether the steel beams came from Dico's buildings that were subject to the EPA Order. The EPA eventually directed Dico to work with an environmental contractor to retrieve and dispose of the insulation that had been removed from the Dico buildings, which resulted in the removal of more than four tons of different types of insulation. Testing of the material revealed the presence of PCBs.

II

We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and giving the non-moving party the benefit of all reasonable inferences. Dowell v. Lincoln Cnty., Mo., 762 F.3d 770, 775 (8th Cir. 2014). Summary judgment is proper only if the moving party satisfies its burden of demonstrating that no genuine issues of material fact remain for trial. Fed. R. Civ. P. 56(a).

-4-

# A

CERCLA imposes strict liability for environmental contamination on

> any person who by contract, agreement, or otherwise *arranged for disposal* or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

42 U.S.C. § 9607(a)(3) (emphasis added).  "Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal." Team Enters., LLC v. W. Inv. Real Estate Trust, 647 F.3d 901, 907 (9th Cir. 2011).

The statute does not define the word "arranged."  However, in interpreting this statutory language, the Supreme Court has held the word "'arrange' implies action directed to a specific purpose." Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 611 (2009).  Under this definition of the provision, the Supreme Court identified three possible scenarios:  (1) "an entity [who] enter[s] into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance" would plainly be liable under CERCLA; (2) an entity who merely "sell[s] a new and useful product" to a purchaser who "unbeknownst to the seller, [later] dispose[s] of the product in a way that [leads] to contamination" would clearly not be liable; and (3) an entity who has "some knowledge of the buyers' planned disposal or whose motives for the 'sale' of a hazardous substance are less than clear" may or may not be held liable. Id. at 610.

In the third type of case, "the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the

transaction as a 'disposal' or a 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." Id. In Burlington, the Court specifically rejected the government's argument that "Congress intended to impose liability on entities not only when they directly dispose of waste products but also when they engage in legitimate sales of hazardous substances knowing that some disposal may occur as a collateral consequence of the sale itself." Id. at 611-12 (internal footnote omitted). Furthermore, the Court specifically rejected the notion that a seller's knowledge that a buyer would dispose of a hazardous substance would alone be sufficient to constitute arrangement for disposal:

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product.

Id. at 612; see also Team Enters., 647 F.3d at 908 ("While actions taken with the *intent* to dispose of a hazardous substance are sufficient for arranger liability, actions taken with the mere *knowledge* of such future disposal are not."); Consol. Coal Co. v. Ga. Power Co., 781 F.3d 129, 149 (4th Cir. 2015) ("Anytime an entity sells a product that contains a hazardous substance, it also 'intends' to rid itself of that hazardous substance in some metaphysical sense. But intent to sell a product that happens to contain a hazardous substance is not equivalent to intent to dispose of a hazardous substance under CERCLA. For arranger liability to attach, there must be something more.").

The only element of the liability language quoted above Dico disputes on appeal is that it "arranged" for disposal of the PCBs. It argues the buildings had at

least some commercial value based on which a fact finder may find Dico did not intend to dispose of the PCBs by selling the buildings to SIM. We agree.

The district court noted the case "exemplifie[d] the practical difficulties in deciding whether an arrangement is a sale or disposal" but nevertheless concluded that no reasonable fact-finder could conclude Dico did not intend to dispose of the remaining PCBs when it sold the buildings to SIM. See Dico, 892 F. Supp. 2d at 1153. In reaching its conclusion, the district court relied primarily on two "battery cracking" cases in which the district courts found the sellers to have "arranged for disposal" when they sold "junk" batteries to a scrap yard that was only interested in the lead within the batteries and would inevitably have to dispose of the contaminated battery casings. See United States v. Atlas Lederer Co., 282 F. Supp. 2d 687 (S.D. Ohio 2001); Catellus Dev. Corp. v. United States, 34 F.3d 748 (9th Cir. 1994). The district court also relied on another district court decision in which the court found a seller "arranged for disposal" when it sold scrap copper wire to a scrap metal company knowing that the sole remaining useful purpose of this copper wire was to reclaim the copper, which required "removal and disposal of the insulation material covering the copper wire." EPA v. TMG Enters., Inc., 979 F. Supp. 1110, 1124 (W.D. Ky. 1997). Despite Dico's assertions that SIM intended to reuse the buildings after disassembly, the district court found Dico "presented no evidence that SIM was interested in any of the building components except for the steel beams." Dico, 892 F. Supp. 2d at 1154. Accordingly, it reasoned that just like in the battery-cracking cases and the copper wire case, where the purchaser was only interested in one internal and valuable part of the sale which would subsequently and necessarily result in the disposal of the remaining parts, the seller arranged for disposal of a hazardous substance. Id. at 1154-55. In other words, the district court believed where the seller knew the buyer would use only part of the contaminated goods and would discard part of the contaminated goods, the seller, as a matter of law, arranged for disposal. However, under the Supreme Court's definition of "arrange," a seller's knowledge of eventual disposal alone is insufficient to find liability as a matter of law.

-7-

In relying on the above cases, the district court improperly focused too closely on the factual similarity between this case and the battery-cracking cases regarding what the buyer was interested in and how it would have to obtain the desired part rather than on the relevant question of the seller's intent with respect to the transaction. In the battery-cracking cases, the sale product was "junk." Accordingly, the district courts in those cases could have concluded at summary judgment—consistent with Burlington's directive that knowledge of inevitable disposal alone is not enough—that the seller was not selling a product but was intending to rid itself of a hazardous substance by transferring a useless product, where it knew disposal of a hazardous substance was certain. Where, however, the sale product has some commercial value and was part of a legitimate sale, even if the seller knows disposal will result, it is more difficult to hold that no reasonable juror could find the seller did not actually intend to sell the product but merely intended to discard the hazardous substance. See, e.g., Schiavone v. Ne. Utils. Serv. Co., No. 3:08CV429, 2011 WL 1106228, at *6 (D. Conn. Mar. 22, 2011) (finding that seller of transformers to a scrap metal yard for the "commercial value of the metal" did not arrange for disposal of a hazardous substance because even if the transformers contained PCBs and even if the seller knew the buyer would inevitably have to dispose of the hazardous substance, there was no "evidence that could support a conclusion that the [seller] had as a purpose in their dealings with [the buyer] disposing of [the hazardous substance]"); United States v. B&D Elec., Inc., No. 1:05CV63, 2007 WL 1395468, at *5-6 (E.D. Mo. May 9, 2007) (finding that seller of operable, intact, and non-leaking transformers did not arrange for disposal of the hazardous substances contained in the transformers).

The parties before us, and other courts, have framed the issue on what has sometimes been referred to as the "useful product defense."

> The defense prevents a seller of a useful product from being subject to arranger liability, even when the product itself is a hazardous substance

that requires future disposal. In other words, a person may be subject to arranger liability "only if the material in question constitutes 'waste' rather than a useful product." A plaintiff can overcome the defense by showing that the substance involved in the transaction "has the characteristic of waste at the time it is delivered to another party."

The useful product doctrine serves as a convenient proxy for the intent element because of the general presumption that persons selling useful products do so for legitimate business purposes. It would be odd, for example, to say that an auto parts store sells motor oil to car owners *for the purpose* of disposing of hazardous waste. Conversely, persons selling or otherwise arranging for the transfer of hazardous waste (which no longer serves any useful purpose) are more likely trying to avoid incurring liability that might attach were they to dispose of the hazardous waste themselves. In other words, the probable *purpose* for entering into such a transaction is to dispose of hazardous waste.

Team Enters., 647 F.3d at 908 (internal citations and footnote omitted). We have not previously considered the defense, and its viability after Burlington is not entirely clear. While there would be liability in the first scenario where "an entity [enters] into a transaction for the *sole purpose* of discarding a used and *no longer useful* hazardous substance" and no liability in the second scenario where the entity arranges for the sale of "a new and useful product" without knowledge of an eventual disposal, in the third scenario, the Court imposed the requirement of a "legitimate sale." See Burlington, 556 U.S. at 610, 612 (knowledge of eventual disposal insufficient to find liability "when the disposal occurs as a peripheral result of the *legitimate sale* of an unused, useful product" (emphasis added)).

As noted above, under the Supreme Court's definition of "arrange," the central question is the intent of the seller in the particular transaction. See Team Enters., 647 F.3d at 909 ("Absent a showing that Street intended for its sale of the Rescue 800 to result in the disposal of PCE, we must conclude that Street lacks the requisite intent for arranger liability."). Like knowledge of eventual disposal, we believe the

usefulness of a product—however defined—is an important but not dispositive factor to consider in determining the seller's intent.[3] A party may sell a still "useful" product, i.e., fit either for its intended purpose or some other purpose useful to the buyer, with the full intention to rid itself of environmental liability rather than a legitimate sale, for example where the cost of disposal or contamination remediation would greatly exceed its purchase price (e.g., selling a working and useful piece of machinery for $10,000 that comes along with a $100,000 price tag for remediation costs). It appears to us that a seller who knew about the contamination in such a sale, if it can be shown the seller intended to arrange for its disposal because the seller knew the buyer would eventually dispose of it, could fall within the scope of the statute, even though the product may be considered "useful." Thus, the "usefulness" of a product does not dispositively show the character of the transaction or the seller's intent. Rather, the touchstone remains whether "the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." Burlington N., 556 U.S. at 610.

Other circuit courts have identified some factors to consider in determining if a transaction was an arrangement for disposal or a sale. See, e.g., Consol. Coal, 781 F.3d at 148 ("[1 T]he intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, [2] the value of the materials sold, [3] the usefulness of the materials in the condition in which they were sold, and [4] the state of the product at the time of transferral (was the hazardous material contained or leaking/ loose)."); Miami-Dade Cnty., Fla. v. United States, 179 F.

---

[3]If "usefulness" is narrowly defined to include only the product's intended purpose, it is possible that no liability would attach even in the sale of a "useless" product. For example, an entity may sell a "useless" product that carries a different purpose to the buyer—either aesthetic or other functional purpose—such that the seller may receive substantial value for the product, even beyond its commercial value, which could make it a "legitimate sale" without an intention to arrange for its disposal.

App'x 658, 661 (11th Cir. 2006) ("In determining whether a party arranged for the disposal or treatment of hazardous substances, relevant factors include: (1) whether a sale involved the transfer of a 'useful' or 'waste' product; (2) whether the party intended to dispose of a substance at the time of the transaction; (3) whether the party made the 'crucial decision' to place hazardous substances in the hands of a particular facility; (4) whether the party had knowledge of the disposal; and (5) whether the party owned the hazardous substances." (internal quotation marks omitted)). At least one other circuit court has also considered the balance of the value received by the seller compared to the cost avoided of having to address the proper disposal or remediation cost. See United States v. Gen. Elec. Co., 670 F.3d 377, 390 (1st Cir. 2012) (finding liability where evidence showed the seller calculated its profits from the sale in comparison to its avoided cost of proper disposal). We believe this to be a valid and important consideration in discerning a seller's intent in a particular transaction.

In this case, the considerations above are heavily disputed. First, the cost of remediating the buildings is not clear from the record. The district court noted Dico may have "eliminated a $2.87 million liability" but also noted Dico heavily disputed the inflated figure. On appeal, Dico asserts the $2.87 million figure is a "wild exaggeration" because it fails to take into account the remediation that was already completed, that only some of the buildings were removed while others remained on the property, and that most of the remediation cost would have been to remove any concrete foundations which remained at the Dico property after the diassembly. Since the district court did not make a finding as to how much it would have cost to remove the contamination from the buildings, we cannot determine how much clean-up-cost liability Dico potentially avoided by selling the buildings.[4]

------

[4]Judge Kelly notes in her cost analysis that comparing the price for which Dico sold the buildings to a reasonable estimate of the cleanup costs compels the conclusion that Dico sold the buildings to avoid the cost of cleanup. While the record contains some evidence Dico may have avoided substantial cleanup costs by selling

Second, we believe there exists an issue of fact regarding the usefulness of the buildings. Indeed, the district court acknowledged there appeared to be an issue of fact: "On the one hand, there is ample evidence supporting an inference that the buildings were not commercially useful and that SIM purchased them only to extract the valuable steel beams. . . . On the other hand, the record contains some evidence suggesting that the entire structures were commercially useful." Dico, 892 F. Supp. 2d at 1158. Nevertheless, the district court reasoned that "there [did not] exist[] any demand for used buildings of the type [Dico] sold to SIM" and that "even if the buildings at issue were usable while erected on Dico's property, once sold, they lost their usefulness because they had to be demolished and removed and could not be disassembled in a way that preserved the integrity of their components for later use." Id. at 1155.

In applying this analysis, the district court too narrowly focused on the value of the buildings as a whole and what SIM specifically intended to do with them. The fact that SIM planned to only use part of the buildings did not mean that other parties could not use the buildings for other purposes. Similarly, the mere fact that some portion of the buildings could not be reused did not necessarily render them entirely commercially useless. The buildings at the heart of the sale were not hazardous products themselves and the evidence in the record does not support a finding that either Dico or SIM viewed the buildings as merely "waste." Indeed, SIM had reused one of the buildings it previously purchased from Dico. Even the district court acknowledged there was conflicting evidence on whether SIM intended to reuse the buildings after it disassembled them. See Dico, 892 F. Supp. 2d at 1143-44.

_____

the buildings, Dico continues to dispute this evidence and the district court did not make a finding of the costs Dico actually avoided by selling the buildings rather than disposing of them. This genuine dispute regarding a material fact precludes summary judgment.

-12-

Moreover, there is no evidence that Dico itself viewed the buildings as useless. To the contrary, evidence in the record shows Dico continued to view them as commercially useful. Additionally, Dico sold the buildings for more than $140,000 and additional consideration, which the district court stated made it "impossible to calculate the true value of SIM's bid." Id. at 1143 n.6. The insulation appears to be the only material the parties agree could not be reused after disassembly of the buildings. But we have no clear indication from the record how much the value of the insulation was in comparison to the rest of the building materials. As such, if the insulation represented a relatively minor portion of the value of the buildings, the buildings may still have been commercially useful. Furthermore, contrary to the district court's finding that the buildings became useless after disassembly, we find the ability to reuse the building components to be a disputed fact. The government relies on several other facts, such as the "commercial reality" of the transaction and Dico's failure to inform SIM of the contamination, to "suggest" Dico's intent, but such a showing, while suggestive, is not sufficient to support summary judgment.

In summary, we believe the district court placed too much emphasis on how SIM specifically intended to use, and actually used, the buildings. The fact that some parts from the buildings were worthless after disassembly does not necessarily transform a potentially legitimate sale of the buildings in which Dico would receive some commercial value into a ploy to simply get rid of the buildings just to dispose of the hazardous substance. Indeed, Dico solicited bids for the sale of the buildings and there was interest beyond just SIM. Overall, unlike cases finding liability at summary judgment, we do not believe the evidence of record demonstrates as a matter of law that Dico was merely trying to get rid of a hazardous substance. Thus, under the particular circumstances of this case and on the record before us, we believe the issue of Dico's intent should not have been decided at summary judgment.

For these reasons, we reverse and vacate the district court's summary judgment order holding Dico "arranged" for disposal of hazardous materials as a matter of law

-13-

under § 9607(a)(3). Accordingly, we also vacate the district court's order with respect to any response costs specifically associated with the district court's finding on the issue of "arranger" liability.

B

The district court awarded both civil penalties and punitive damages against Dico after finding Dico violated Paragraphs 31 and 59 of the EPA Order. Specifically, the district court found Dico had violated Paragraphs 31 and 59 of the EPA Order for 162 days, and awarded $10,000 per day for a total civil penalty of $1,620,000. The district court also awarded $1,477,787.73 in punitive damages, an amount equal to the "response costs" the Fund incurred by cleaning up the SIM site.

We affirm the district court's award of civil penalties. However, punitive damages are available only if the Fund incurs costs cleaning up the damage caused by a release or threat of release of hazardous substance. 42 U.S.C. § 9607(c)(3). Because the Fund incurred no costs to clean up the *teardown site*, the Fund did not incur any costs as a result of Dico's violation of the EPA Order and therefore the district court erred when it awarded punitive damages based on cleanup costs of the SIM site. Accordingly, we reverse the district court's award of punitive damages.

1.    Civil Penalties

Under CERCLA, "[a]ny person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any [EPA] order . . . may . . . be fined not more than $25,000[5] for each day in which such violation occurs or such failure to comply continues." 42 U.S.C. § 9606(b)(1). Even if the district court finds a willful

---

[5]Indexed for inflation, the penalty amount for the applicable period is $32,500. See 40 C.F.R. § 19.4.

violation, it has the discretion of whether to impose civil penalties. See Gen. Elec. Co. v. Jackson, 610 F.3d 110, 119 (D.C. Cir. 2010). To demonstrate sufficient cause for a violation or non-compliance as a defense, Dico must show it had "an objectively reasonable basis for believing that the EPA's order was either invalid or inapplicable to it." Solid State Circuits, Inc. v. EPA, 812 F.2d 383, 391 (8th Cir. 1987).

Dico asserts that four factual issues precluded the imposition of civil penalties. We find no triable issues relevant to the civil penalties the district court imposed.

Paragraph 31 of the EPA Order required Dico to submit to the EPA for approval an operation and maintenance plan "present[ing] the actions necessary to ensure the protectiveness and integrity of the removal action, including long-term maintenance of all interior surface sealing, encapsulation of all building insulation and appropriate reporting, including, at a minimum, submittal of a written report on an annual basis." Thus, through the operation and maintenance plan, the EPA Order required Dico to maintain and protect the integrity of the sealing and encapsulation of the building insulation. By allowing for the disassembly of the buildings such that "lots of little pieces of insulation fell to the ground and were blown around," (undisputed testimony of SIM's President regarding his observations of the disassembly process) Dico necessarily violated the terms of the EPA Order. Its argument that the government failed to show any explicit evidence of the actual release of PCBs through the disassembly process is immaterial to the issue.[6]

---

[6]Judge Loken argues the district court award erred by finding a 162-day violation when there was no actual release of hazardous substances. Paragraph 31 of the EPA Order, however, required Dico to ensure "long term maintenance of all interior surface sealing" and "encapsulation of all building insulation." Dico violated this Order because it breached the interior surface sealing and failed to keep the building insulation encapsulated during the entire 162-day building teardown. Therefore, Dico action violated the EPA Order, regardless of whether the EPA proved this violation released hazardous substances.

We also agree with the district court that Dico violated Paragraph 59 of the EPA Order, which required Dico to "immediately take all appropriate action" and to "immediately notify" the EPA in the event of any "change in site conditions . . . [that] causes or threatens to cause an additional release of hazardous substances from the Dico Property." Since there is no genuine dispute the disassembly destroyed the protection and integrity of the encapsulation, we find little difficulty in holding that the disassembly constituted a change in site conditions that, at the very least, threatened the release of hazardous substances from the Dico buildings. Indeed, in the operation and maintenance plan, Dico itself provided that "any event that causes significant damage to the structure of any of the six buildings" would constitute "an emergency event" that had the "potential [for] exposure suddenly and in quantities that may be harmful to human health and the environment."

Dico argues it should not be subject to penalties because it had "sufficient cause" to violate the EPA Order on two grounds: it reasonably believed (1) no PCBs actually remained in the buildings; and (2) it had been relieved of its obligations. We disagree on both accounts.

First, we find meritless Dico's argument that it could reasonably believe no PCBs actually remained in the buildings after its initial remediation work in the 1990s. The fact that no PCBs were detected in surface wipe samples of the buildings —which merely tested the effectiveness of the encapsulation—in no way indicated that no PCBs remained within the insulation. To the contrary, the author of Dico's own 1997 Report, James Fechter, explicitly testified that PCBs remained in the buildings after encapsulation. Moreover, the notion that Dico would agree to such extensive and expensive remediation responsibilities for so many years if it believed no PCBs remained in the buildings seriously belies its litigation position now, particularly in the absence of any evidence it took such a position prior to this

litigation.[7]  Thus, we find that if Dico believed no PCBs remained, its belief was unreasonable.

Second, we reject Dico's assertion that a September 2003 EPA letter released it from its obligations under the operation and maintenance plan.  We do not believe the letter can reasonably be read in such a way.  The letter on its face makes no such representation whatsoever and the sentence Dico relies on specifically states that any future demolition of the buildings would be "subject to certain requirements for operation and maintenance."  Furthermore, as the district court explained in its summary judgment order finding a violation of the EPA Order, on at least two occasions after the 2003 EPA letter but before the disassembly began, the EPA reaffirmed to Dico that the obligations under the operation and maintenance plan remained in effect.  See United States v. Dico, No. 4:10-cv-00503, Dkt. No. 128, at 36-37 (S.D. Ia. Mar. 6, 2013).  Moreover, in its April 17, 2003, letter, Dico expressly stated that it will send the EPA "an annual report . . . verifying that the buildings have remained unused" and "[i]f operations resume inside the buildings, Dico will resume the O&M [(operation and maintenance plan)] requirements."  There is simply no credible evidence to support an assertion that the EPA released Dico from its operation and maintenance plan responsibilities entirely or that Dico could reasonably believe so.

Dico's final argument is that any violation of the EPA Order was merely a one-time violation and not a continuing violation.  We agree with the district court that Dico's argument confuses the basis of its violations.  Regardless of Dico's failure to notify the EPA of the disassembly, its failure to maintain the protection and integrity

---

[7]Dico also implicitly acknowledges it cannot make this showing when it states in its brief that "80 to 90 percent, and *perhaps* all, of the PCBs that once may have existed in the insulation of those buildings had been removed by 1997." (emphasis added).

-17-

of the encapsulation continued throughout the disassembly process and constituted a continuing violation. We therefore affirm the award of civil damages.

## 2. Punitive Damages

42 U.S.C. § 9607(c)(3) allows a court to award punitive damages against a party who "fails without sufficient cause to properly provide removal or remedial action" in response to an EPA order like the 1994 EPA Order. Under this subsection, punitive damages must be "at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action." 42 U.S.C. § 9607(c)(3). The statute gives the district court discretion to award punitive damages within a range, which is based on a specific dollar amount: the amount the Fund incurred in cleanup costs as a result of the liable party's failure to comply with the EPA order.

In this case, the Fund incurred cleanup costs at the SIM site, but it did not incur these costs "as a result of" Dico's violation of the EPA Order. As discussed in Part II.B.1 above, Dico violated Paragraph 31 when it disassembled the buildings without EPA approval and without protecting the integrity of the sealing and encapsulation of the building, and it violated Paragraph 59 when it failed to notify the EPA of this change in conditions. As a result of these violations, Dico scattered pieces of insulation on the ground *at the teardown site*. But the Fund did not clean up the pieces of insulation that Dico scattered across the teardown site as a result of these violations. Nor did it perform any cleanup at the teardown site. Rather, the Fund only incurred cleanup costs from "locating the Dico building debris [at the SIM site], conducting sampling at the SIM site, overseeing the SIM cleanup, and enforcing this action for cost recovery and penalties at the SIM site." Dico, 892 F. Supp. 2d at 1147 n.17 (internal quotation omitted). All of these cleanup costs arose after SIM purchased the beams from Dico and transported them from the teardown site to the SIM site, approximately 100 miles away. Therefore, all of these cleanup costs arose

as a result of Dico's sale of the beams to SIM.  None of them arose "as a result of" Dico's violation of the EPA Order.

As discussed in Part II.A, Dico might ultimately be found liable under a theory of arranger liability for its sale of the beams to SIM, but at this point a fact question remains that precludes summary judgment on arranger liability.  So too with punitive damages.  The cleanup costs at the SIM site derive from Dico's sale of the beams to SIM.  Therefore, since we cannot say as a matter of law Dico is liable for arranging for the disposal of the beams it sold to SIM, nor can we say as a matter of law it is liable (through punitive damages) for the cleanup costs the Fund incurred at the SIM site as a result of the sale of the beams to SIM.  Our holding that the district court improperly granted summary judgment on the issue of arranger liability necessarily requires us to reverse the district court's award of punitive damages based on cleanup costs at the SIM site.

In short, since the Fund did not perform any cleanup at the teardown site, it did not incur any costs "as a result of" Dico's violation of the EPA Order, and without cleanup costs Dico cannot be liable for punitive damages under § 9607(c)(3).  The district court's award of punitive damages is vacated and remanded for further proceedings consistent with this opinion.

### III

For these reasons, we reverse the district court's summary judgment orders with respect to the issues of "arranger" liability and punitive damages and affirm its orders with respect to the EPA Order violations and civil penalties.

LOKEN, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts II.A. and II.B.2. of Judge Bye's opinion. I also agree that Dico is subject to an award of civil penalties for willful violation of an administrative order but would remand for redetermination of the amount of the penalties and therefore respectfully dissent in part from Part II.B.1.

**A. Arranger Liability.** I join Part II.A. of Judge Bye's opinion but add the following to clarify my interpretation of the Supreme Court's controlling decision in Burlington N. & Santa Fe Ry. v. United States, 556 U.S. 599, 608-13 (2009), where the Court addressed the "fact-intensive" question of when 42 U.S.C. § 9607(a)(3) arranger liability attaches.

In Burlington Northern, after a six-week bench trial, the district court concluded that Shell Oil Company was liable as an arranger for selling hazardous chemicals to a "sloppy" distributor, knowing there would be leaks and spills in the delivery and storage process. Id. at 605. The Ninth Circuit affirmed, concluding that an entity can "arrange for disposal" even if it did not intend to dispose of a hazardous substance. The Supreme Court reversed, concluding "that Shell was not liable as an arranger for the contamination that occurred at [the distributor's] facility." Id. at 613. The Court explained that arranger liability is "less clear" in

> cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear. In such cases . . . determin[ing] whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization as a "disposal" or a "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions.

Id. at 609-10 (citations omitted). The Court rejected the government's contention that "Congress intended to impose liability on entities . . . when they engage in legitimate sales of hazardous substances knowing that some disposal may occur as a collateral consequence of the sale itself." Id. at 611-12. Instead, the Court ruled,

> In order to qualify as an arranger, Shell must have entered into the sale of D-D with the intention that at least a portion of the product be disposed of *during the transfer process* by one or more of the methods described in § 6903(3). . . . [T]he evidence does not support an inference that Shell intended such spills to occur. . . . Shell's mere knowledge that spills and leaks continued to occur is insufficient. Id. at 612-13 (emphasis added).

This is not a case like Burlington Northern where there is no evidence that Dico intended to dispose of a hazardous substance. But as the Fourth Circuit explained:

> Anytime an entity sells a product that contains a hazardous substance, it also intends to rid itself of that hazardous substance in some metaphysical sense. But intent to sell a product that happens to contain a hazardous substance is not equivalent to intent to dispose of a hazardous substance under CERCLA. For arranger liability to attach [under Burlington Northern], there must be something more.

Consol. Coal Co v. Ga. Power Co., 781 F.3d 129, 149 (4th Cir. 2015). This is the fact-intensive inquiry Burlington Northern requires.

Despite acknowledging numerous fact disputes, the district court granted summary judgment for plaintiff United States because "no reasonable fact-finder could conclude that . . . [Dico] did not intend to dispose of the remaining PCB when they sold the buildings to SIM," and "no reasonable fact-finder could conclude that the buildings at issue were commercially useful." United States v. Dico, Inc., 892 F. Supp. 2d 1146, 1156-57 (S.D. Ia. 2012). I agree with Judge Bye the district court

-21-

placed too much emphasis on the value of the buildings and what SIM intended to do with them, losing sight of the touchstone issue -- whether "the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." Burlington Northern, 556 U.S. at 610.

I am somewhat concerned that Judge Bye's opinion places too much emphasis on the analysis of arranger liability in pre-Burlington Northern cases. In my view, the earlier "battery cracking" cases should be disregarded, not distinguished. Even if those decisions were sound, the analysis was inconsistent with the Supreme Court's in Burlington Northern. Likewise, the pre-Burlington Northern "useful product" doctrine, which the Ninth Circuit has continued to apply, was not adopted by the Supreme Court in Burlington Northern. Rather, the Court expressly put in the middle category of cases requiring fact-intensive inquiry those "in which the seller has some knowledge of the buyers' planned disposal or whose motives for the sale of a hazardous substance are less than clear."

Most of the cases in which our sister circuits developed what might be called multi-factor tests involved appeals from the grant of summary judgment imposing or denying arranger liability. See, e.g., Consol. Coal, 781 F.3d 129 (4th Cir. 2015) (affirming summary judgment of no liability); NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682 (7th Cir. 2014) (same); United States v. Gen. Elec. Co., 670 F.3d 377 (1st Cir. 2012) (affirming summary judgment imposing arranger liability); Team Enters., LLC v. W. Inv. Real Estate Tr., 647 F.3d 901 (9th Cir. 2011) (affirming no liability). Under Burlington Northern, comprehensive analysis is needed when a court is entering final judgment on arranger liability, and these opinions contain a great deal of useful analysis geared to the fact situations there at issue. But here, I conclude there are genuine disputes as to facts that are material to the issue of arranger liability under Burlington Northern. That is all we need decide. Therefore, I agree we should vacate the grant of summary judgment imposing arranger liability,

-22-

the order assessing response costs for government expenses in remedying contamination at the SIM site in Ottumwa, and the award of punitive damages.

**B. Civil Penalties.** A confusing aspect of this case is the fact that Dico's alleged arranger liability turns on contamination found at one CERCLA site, the SIM property in Ottumwa, whereas the district court assessed civil penalties and punitive damages for Dico's alleged violation of the EPA's 1994 administrative order requiring remedial actions at a second CERCLA site that includes Dico's property in Des Moines. CERCLA provides that any person "who, without sufficient cause, willfully violates, or fails or refuses to comply with" an administrative order issued in connection with a CERCLA abatement action "may . . . be fined not more than [$32,500] for each day in which such violation occurs or such failure to comply continues." § 9606(b)(1). I agree with the district court that the statutory standard that governs the EPA in assessing administrative penalties governs a district court exercising its discretion to determine the amount of a civil penalty:

> In determining the amount of any penalty assessed . . . the President shall take into account the nature, circumstances, extent and gravity of the violation or violations and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation, and such other matters as justice may require.

42 U.S.C. § 9609(a)(3); cf. 33 U.S.C. § 1319(d) (mandating nearly identical standards when a court determines the amount of civil penalties to impose for violation of an EPA compliance order issued under the Clean Water Act).

The district court concluded as a matter of law that Dico violated two paragraphs of the 1994 administrative order for 162 days, the time it took to complete disassembly of the buildings on the Dico property -- paragraph 31, which required Dico to implement a Maintenance Plan that included "long term . . . encapsulation of

-23-

all building insulation," and paragraph 59, which required Dico to "immediately notify EPA's designated Project Coordinator" if any "change in site conditions, during the action conducted pursuant to this Order causes or threatens to cause an additional release of hazardous substances from the Dico Property." After a bench trial to determine the amount of civil penalties and punitive damages, the court assessed penalties of $10,000 per day for 162 days, a total of $1,622,000.00.

I agree with my colleagues that the record established at least a one-day violation of paragraph 59 for Dico's willful failure to notify EPA before it demolished or disassembled the buildings in 2007. That was a change in site conditions that threatened the release of any PCBs that remained in insulation that was not destroyed during the primary site clean-up completed in 1997. See All Regions Chem. Labs, Inc. v. EPA, 932 F.2d 73, 74-75 (1st Cir. 1991), where the EPA assessed, and the court upheld, a one-day administrative penalty of $20,000 for the failure to give immediate notice of a far more serious actual release of hazardous chemicals into the atmosphere. But the finding of multiple violations of paragraph 31 is more problematic. In September 2003, after Dico submitted a revised work plan advising that it may demolish the buildings in question, EPA replied:

> The EPA does not necessarily object to demolition of the buildings, but urges Dico to coordinate any plans for demolition of the buildings with EPA. Certain disposal requirements may apply for building debris, and the EPA or state would want to oversee the demolition.

Demolition of the buildings would necessarily end permanent encapsulation of their insulation. No doubt the failure to notify was at least a one-day violation of paragraph 31, as well as paragraph 59, but the finding of 162 days is unsupported.

The dominant purposes of CERCLA, and therefore the administrative order in question, are to prevent the release of hazardous substances and to take appropriate

-24-

remedial action when releases have occurred. See 42 U.S.C. §§ 9604, 9606(a). Thus, Dico's failure to give timely notice of a change in site conditions that threatened a release of the encapsulated insulation was clearly at least a one-day violation. But disassembling the buildings at the site for 162 days was not even arguably a 162-day violation if there was no *actual* release of hazardous substances during that activity. The district court granted summary judgment that a 162-day violation had occurred because reports from the 1990's established that "demolishing the buildings necessarily resulted in a release of PCB." Dico, 4 F. Supp. 3d at 1066 n.36. But there was no *proof* of an actual release. An EPA report following discovery of the demolition stated that "EPA is following up to determine whether PCB contaminated insulation may have been disposed of improperly." Yet the government asserted no claim for response costs at the Dico site, and presented no evidence that hazardous substances were in fact released by debris, including insulation, that was deposited on the property during the disassembly process. Indeed, the district court expressly found that "[t]here has been no evidence of actual harm to people and/or animals as a result of the dismantling/demolition of the Dico Buildings." Id. at 1055.

In determining the amount of civil penalties to assess, the district court stated that "discussing the evidence concerning PCB concentration is unnecessary in this case." Id. at 1064 n.40. In my view, this was an erroneous interpretation of § 9609(a)(3) and therefore an abuse of the court's discretion in determining the amount of civil penalties. The court also observed that "Dico created another Superfund site (the SIM site in Ottumwa, Iowa), thus causing the EPA to spend Superfund money in investigating the PCB release at the SIM site." Id. at 1064. I agree that if, *in fact*, Dico's actions in disassembling the buildings without notice to EPA resulted in the transfer of PCB-contaminated steel beams that proximately caused the release of hazardous substances at the SIM site, that would be highly relevant in determining the amount of civil penalties to assess for Dico's violation of the 1994 administrative order. But that question turns on disputed issues of material

-25-

fact that have led us to reverse the grant of summary judgment holding Dico liable as an arranger for response costs at the separate SIM CERCLA site.

A massive civil penalty may not be assessed unless it is warranted by the "extent and gravity of the violation." § 9609(a)(3). Accordingly, I would remand for a redetermination of the amount of civil penalties that should be assessed.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I agree with the court's decision to affirm the summary judgment order with respect to the EPA order violation and civil penalties. I disagree that the district court erred in granting summary judgment on the question of arranger liability, and therefore with this court's decision to reverse the district court's award of punitive damages on that basis. Therefore, I respectfully dissent from Part II.A of the court's opinion and the portions of Part II.B that discuss punitive damages.

According to Burlington Northern, "[i]n order to qualify as an arranger, [Dico] must have entered into the sale of [the buildings] with the intention that at least a portion of the [hazardous] product be disposed of during the transfer process." Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 612 (2009). My reading of the undisputed facts leads me to conclude that Dico had the requisite intent to dispose of the PCB-laden insulation to support a finding of arranger liability.

As the court notes, other circuits have developed multi-factor tests that are useful in determining whether a given transaction qualifies as an arrangement for disposal. The Fourth Circuit has outlined the following four relevant, and helpful, factors:

[1] the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, [2] the value of

-26-

the materials sold, [3] the usefulness of the materials in the condition in which they were sold, and [4] the state of the product at the time of transferral (was the hazardous material contained or leaking/loose).

Consol. Coal Co. v. Ga. Power Co., 781 F.3d 129, 148 (4th Cir. 2015) (quotation omitted). In my view, each of these factors weighs in favor of finding Dico liable as an arranger.

The first factor is the "intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused." Id. According to the testimony of Jim Hughes, president of SIM, SIM only ever intended to buy the beams. And according to Hughes's testimony, Dico was aware of SIM's intent. Hughes testified that prior to the sale he told Dico consultant and former employee Don Brown "that SIM wanted to buy only the steel beams from the buildings" and that they had discussed "the need to discard other building components." Hughes testified that during the dismantling process "lots of little pieces of insulation fell on the ground and were blown around," that the "insulation was being loaded into Waste Management Inc. dumpsters for disposal," and that Brown was on-site during these activities.[8] He also said he specifically told Brown "that debris including the insulation was going to be hauled to a landfill." The president of Titan testified that he himself visited the site "on a weekly basis" during the dismantling process.

Defendants' own Statement of Additional Material Facts states that when he sold the building to SIM, Titan Tire president Bill Campbell "believed that Titan Tire, on behalf of Dico, was selling a commercially useful product—being the *steel beams*—for a reasonable value, inasmuch as it was his understanding that SIM

_____

[8]Prior to the transaction presently at issue, SIM had bought a similar building from Dico—one not covered by the 1994 UAO—and this building had been dismantled and its insulation disposed of in the same fashion.

-27-

intended to reassemble the *steel beams* on its property in Ottumwa for use in its business operations." (Emphases added.) It was "the intent of the parties to the contract" that the beams would be "reclaimed and then reused," not that the buildings would be reused in their "entirety." In fact, there was testimony from defendants' own witness that "it doesn't make sense" to re-use insulation and that he had never seen it done in forty years of demolition experience. The contract itself instructed SIM to "demo" (demolish) the buildings. Cf. Pneumo Abex Corp. v. High Point, Thomasville and Denton R.R. Co.,142 F.3d 769, 775 (4th Cir. 1998) ("The intent of both parties to the transaction was that the wheel bearings would be reused *in their entirety* in the creation of new wheel bearings." (emphasis added)).

A second relevant factor is the "value of the material sold." Consol. Coal, 781 F.3d at 148. The court acknowledges that a comparison of the price received by the seller to the avoided cost of proper disposal is a relevant indication of a seller's intent in a transaction. See United States v. Gen. Elec. Co., 670 F.3d 377, 390 (1st Cir. 2012). Dico sold Building 2 for $5,000 and the Maintenance Building for $12,000. SIM paid $143,200 for Buildings 4 and 5, as well as the Production Building, which was not subject to the 1994 UAO. While the district court did not make a finding on the exact amount of clean-up cost Dico avoided by selling the buildings, in 1996 the EPA estimated that it would cost $2.87 million to properly remediate the Dico buildings governed by the 1994 UAO—$4.39 million in today's dollars. This court properly notes that Dico disputes this number, arguing that the buildings sold to SIM represent only four out of the six buildings included in the remediation estimate and SIM was not responsible for the removal of the foundations. While their objection is noted, there is nothing in the record to suggest that a building such as Building 2 could be properly remediated for less than $5,000, even leaving its foundation untouched. Indeed, after the demolition was discovered, Dico hired an environmental contractor to properly dispose of the insulation, employing a three-man crew over two separate days to haul the insulation in a HAZMAT truck to an EPA-approved toxic

landfill in Nevada (the total cost of this endeavor is not in the record). The EPA additionally spent $91,727.51 in the cleanup effort.

Most notably in this cost analysis, SIM was never informed that the buildings contained PCBs, and SIM's president testified that this information would have affected his estimation of the value of the property. PCB-contaminated beams are worth less than PCB-free beams, and SIM assumed it was purchasing the latter, not the former. Dico presented no evidence even to suggest that it took any precautionary steps to ensure any possible contamination was contained prior to or during the dismantling process. Cf. Consol. Coal, 781 F.3d at 149–50 (ruling that defendant did not have requisite intent to dispose of PCBs when it only sold transformers that contained less than 50 ppm of PCBs and those that had higher contaminations were destroyed in accordance with the Toxic Substances Control Act of 1964); Burlington N., 556 U.S. at 613 (explaining that defendant had taken precautionary measures in order to prevent leaks from occurring, including providing safety manuals to its purchasers, and "providing discounts for those that took safety precautions").

The third factor of the Fourth Circuit's test is "the usefulness of the materials in the condition in which they were sold." Consol. Coal, 781 F.3d at 148. The beams were useless with the insulation still attached, i.e., in the condition in which they were sold. Dico's own building demolition expert Daniel Hoffman admitted that it was necessary to strip away the insulation to "get at the beams." He also testified that in his forty years of demolition experience he had never seen a commercial buyer reuse the insulation from these kind of buildings and that it "doesn't make sense to reuse it." The court speculates about whether other parties could have used other parts of the buildings, but no evidence to this fact was presented to the district court.[9] The

_____

[9]The court distinguishes the "battery-cracking" cases and the copper wire case by saying the sale product in those circumstances was "junk." Yet the buildings in the present case had been left abandoned for years, one building was sold for a mere $5,000, most of its components were discarded on site, and its beams were hauled

only evidence presented was Campbell's assertions that it was his intent to sell a useful product. In determining arranger liability, however, courts must undergo a "fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale'" to discern whether arranger liability is appropriate. Burlington N., 556 U.S. 610. "Frequently, the most probative evidence of intent will be objective evidence of what happened rather than evidence describing the subjective mind of the actor." United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1233 (6th Cir. 1996) (quotation omitted).

The fourth factor is "the state of the product at the time of transferral (was the hazardous material contained or leaking/loose)." Consol. Coal, 781 F.3d at 148. A key fact that cannot be overlooked in this case is that the PCB-laden insulation was discarded *at the Dico site* in the presence of Dico employees. At the time of transferral the toxic product was not just "leaking" or "loose"—it was actively being discarded as a *part* of the transfer. On this issue, there is no dispute.

Taken together, these factors support the conclusion that Dico intended to dispose of the PCB-laden insulation contained within its buildings. Hughes testified that he was told Dico "wanted the buildings torn down to accommodate" a "large development project." The fact that Dico was able to receive a sum of money for the beams contained within the buildings does not negate the fact that they wanted the buildings, and their PCB-contaminated insulation, gone.[10] See Consol. Coal, 781

_____

away to an open field and left there among old motors and twisted pipes. One of defendants' own experts, Dr. Remy Hennet, called the SIM site "a junk yard." If the sale product in the battery-cracking cases was "junk," the Dico buildings could be viewed in largely the same way.

[10]I agree with the court's conclusion in Part II.B that Dico could not have reasonably believed no PCBs remained in the buildings.

F.3d at 147 (stating that <u>Burlington Northern</u> does not "foreclose arranger liability as a matter of law based on *secondary intent*" (emphasis added)).

Knowledge alone is insufficient to find that a party had the intent to arrange for disposal. <u>Burlington N.</u>, 556 U.S. at 612. But the evidence in this case supports significantly more than Dico's mere awareness that somewhere down the road some amount of toxic material could be released by the purchaser of their otherwise useful buildings. Dico cites to a Seventh Circuit decision finding that once a defendant sells a useful product to a third party, the toxins contained in the product are "out of the seller's hands." <u>NCR Corp. v. George A. Whiting Paper Co.</u>, 768 F.3d 682, 706 (7th Cir. 2014). The court ruled that this "lack of control is a good reason to find" that defendants did not arrange for disposal. <u>Id.</u> However, the court added: "we do not mean to suggest that an ostrich approach would work." <u>Id.</u> And an ostrich approach should not work here, either, where Dico hid the very fact of the buildings' contamination from their purchaser. Dico presented no evidence at the district court, beyond its own characterization of its intent, to create a genuine dispute of material fact regarding whether it qualified as an arranger. The facts, viewed in the light most favorable to Dico, still show that it intended "at least a portion of [the hazardous product] be disposed of during the transfer process." <u>Burlington N.</u>, 556 U.S. at 612.

———————————————