**UNITED STATES of America, Plaintiff,**

v.

**DICO, INC. and Titan Tire Corporation, Defendants.**

**4:10–cv–00503**

United States District Court, S.D. Iowa, Central Division.

**Signed 12/29/2016**

---

Elizabeth L. Loeb, Eric C. Albert, Sara C. Colangelo, Steven D. Shermer, Zachary Nathaniel Moor, U.S. Department of Justice–Environment & Natural Resources Environmental Enforcement Section, Washington, DC, Robyn E. Hanson, United States Department of Justice, Enrd, Denver, CO, Plaintiff.

Michael F. Iasparro, Hinshaw & Culbertson LLP, Rockford, IL, Sergio Enrique Acosta, Thomas D. Lupo, Joel David Bertocchi, Hinshaw & Culbertson LLP, Chicago, IL, Mark McCormick, Stephen H. Locher, Belin McCormick, P.C., Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, Judge

Before the Court are two motions seeking partial summary judgment filed by Dicó, Inc. ("Dico") and Titan Tire Corporation ("Titan Tire") (collectively "Defendants") on May 16, 2016. Clerk's Nos. 235, 236. The United States of America ("Plaintiff" or the "Government") responded to both motions on June 13, 2016. Clerk's Nos. 251, 252. Defendants replied on June 28, 2016. Clerk's Nos. 256–1, 256–2, 259. With leave of the Court, the Government filed a surreply addressing both motions. Clerk's No. 264.

Also before the Court is a motion to exclude certain issues from trial on re-

mand filed by the Government on June 1, 2016. Clerk's Nos. 246, 246–1. Defendants responded on July 8, 2016. Clerk's No. 267. The Government replied on July 18, 2016. Clerk's No. 272.

The matters are fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case stems from the sale of several buildings by Dico, through its corporate affiliate Titan Tire, to Southern Iowa Mechanical ("SIM"). *United States v. Dico, Inc.*, 808 F.3d 342, 345 (8th Cir. 2015). In March 1994, many years prior to the sale in question, the Environmental Protection Agency ("EPA") discovered the presence of hazardous Polychlorinated Biphenyls (PCBs) in adhesive contained in the insulation of Buildings 2, 3, 4, and 5 as well as the Maintenance building on land owned by Dico in Des Moines, Iowa ("the Dico site"). *Id.* Relying on its authority to issue "such orders as may be necessary to protect public health and welfare and the environment" under 42 U.S.C. § 9606(a), the EPA issued an administrative order ("the EPA Order") requiring Dico to remove some PCB contamination and encapsulate all the remaining insulation in the buildings to prevent the further release of PCBs into the environment. *Dico*, 808 F.3d at 345.

The EPA Order imposed continuing obligations on Dico concerning the affected buildings. *Id.* at 352–53. In particular, paragraph 31 of the order required Dico to submit an operation and maintenance plan addressing "the actions necessary to ensure the protectiveness and integrity of the removal action," including necessary maintenance of all interior surface sealing and insulation encapsulation on the buildings. *Id.* at 352. The same paragraph also required Dico to complete "appropriate re-

porting, including, at a minimum, submittal of a written report on an annual basis." *Id.* In addition to these maintenance and reporting requirements, the EPA Order required Dico to communicate with the EPA under specified circumstances. *Id.* at 353. Specifically, paragraph 59 of the order required Dico to "immediately take all appropriate action" and "immediately notify" the EPA should any "change in site conditions" cause or threaten to cause the further release of hazardous substances. *Id.*

In 2007, Titan Tire entered into three transactions with SIM on behalf of Dico involving buildings that were subject to the EPA Order, including one transaction for the disassembly and removal of the Maintenance Building, one transaction for the purchase of the western portion of Building 3, and one transaction for the purchase of Buildings 4 and 5 and the northern portion of the Production Building. *Id.* at 345. After purchasing the buildings, each of which was subject to the EPA Order with the exception of the northern portion of the Production Building, SIM dismantled them and disposed of all the materials used to construct them other than the steel beams they contained, which SIM relocated to a storage site in Ottumwa, Iowa ("the SIM site"). *Id.* at 346.

In September 2007, the EPA observed that most of these buildings had been dismantled and learned of the sale for the first time. *Id.* The EPA subsequently traced the steel beams to the SIM site, where it discovered PCBs in insulation still attached to the beams and in soil in the area. *Id.* The EPA was able to determine that the beams came from buildings Dico had sold to SIM. *Id.* However, the EPA had no means of precisely tracing the origin of the PCBs discovered at the SIM site and could not confirm whether the beams came from the Dico buildings subject to the EPA Order. *Id.*[1] Following unsuccess-

---

1. Dico also sold SIM a building known as the Weld Shop in 2004. Clerk's No. 119 at 4.

ful negotiations to reach an administrative settlement with Defendants regarding the cleanup of the SIM site, the EPA issued a new order directing Dico to work with an environmental contractor to retrieve the insulation removed from the Dico buildings from the SIM site and dispose of it. *See id.*; Clerk's No. 128 at 12; *see also* Clerk's No. 239–39. More than four tons of insulation were removed from the SIM site, the testing of which revealed the presence of PCBs. *Dico*, 808 F.3d at 346.

In October 2010, the Government filed this suit against Dico and Titan Tire under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Clerk's No. 1. In the complaint, the Government alleged that Defendants violated 42 U.S.C. § 9607(a) by arranging for the disposal of a hazardous substance by entering into the transactions that resulted in the dismantling of buildings subject to the EPA Order. *Id.* at 1–2, 8, 11–12. In connection with this arranger liability claim, the Government sought to recover all past and future response costs it incurred in connection with response actions pertaining to the SIM site pursuant to 42 U.S.C. § 9604. *Id.* at 11–12, 14. The Government also alleged that Dico violated 42 U.S.C. § 9606(b)(1) by violating the terms and conditions of the EPA Order governing the buildings subject thereto. *Id.* at 9–10, 12–14. In connection with the latter allegation, the Government made two distinct claims, including one seeking civil penalties and one seeking punitive damages based on the costs it incurred in responding to the release or threatened release of PCBs at the SIM site in reliance on 42 U.S.C. § 9607(c)(3). *Id.* at 12–14.

In August 2012, the Court heard oral argument on three pending motions for partial summary judgment filed by the Government, including a motion for partial summary judgment on arranger liability, a motion for partial summary judgment as to Dico's liability for civil penalties and punitive damages, and a motion for partial summary judgment on the recoverability of the Government's response costs related to the SIM site removal action. *See* Clerk's Nos. 79, 98; *see also* Clerk's Nos. 61, 62, 63, 68, 69, 70, 74, 75, 78. With the Court's permission, both parties submitted supplemental briefing on the motions following the hearing. *See* Clerk's Nos. 94, 95, 96, 122, 123, 125–1, 127; *see also* Clerk's Nos. 98, 126.

Thereafter, the Court entered two separate orders on the three pending motions for partial summary judgment. Clerk's Nos. 119, 128. On September 24, 2012, the Court granted partial summary judgment to the Government on the arranger liability claim, concluding Defendants intentionally arranged for the disposal of PCBs by selling the PCB-contaminated buildings to SIM. Clerk's No. 119 at 14–40. On March 6, 2013, the Court also granted partial summary judgment to the Government on the question of whether Dico violated the EPA Order. Clerk's No. 128 at 37, 39, 43. Specifically, the Court concluded that Dico violated paragraph 31 of the order by arranging for the demolition of the buildings subject thereto. Clerk's No. 128 at 37. The Court also concluded that Dico violated paragraph 59 of the order by failing to immediately notify the EPA of the resulting change in conditions at the Dico site because demolishing the regulated buildings necessarily resulted in the release of PCBs. *Id.* at 39. Because the Court determined that Dico lacked sufficient cause to violate the order, it concluded Dico may be

---

After purchasing the Weld Shop, SIM disassembled it at the Dico site and the steel beams it contained were transported to the SIM site.

*See id.* at 4–5. The Weld Shop was not subject to the EPA Order as it had never been tested for PCBs. *Id.* at 4.

liable for both civil penalties and punitive damages. *Id.* at 30–31, 40–42. In light of its prior ruling on arranger liability, the Court also ruled that Defendants were liable for all response costs the Government had incurred or would incur "as a result of the SIM site removal action." *Id.* at 43. But the Court concluded a bench trial was necessary to determine "the amount, if any, of civil penalties and/or punitive damages to be assessed." *Id.*

In December 2013, the Court held a bench trial on the appropriate civil penalties and punitive damages to be assessed against Dico based on its violation of the EPA Order. Clerk's No. 198 at 2; *see* Clerk's Nos. 192, 193, 194. On February 24, 2014, the Court issued an order on the bench trial directing the entry of judgment against Defendants jointly and severally for $1,477,787.73 in response costs already incurred and reported in connection with the SIM site on the arranger liability claim as well as the entry of judgment against Dico for $1,620,000.00 in civil penalties ($10,000.00 per day for each of the 162 days during which the disassembly of the buildings took place) and $1,477,787.73 in punitive damages based on its violation of the EPA Order. Clerk's No. 198 at 14, 28–31. The latter award was equivalent to the total response costs the EPA had already incurred and reported in connection with the SIM site. Clerk's No. 198 at 30. In the same order, the Court held the Government was entitled to the entry of a declaratory judgment against Defendants "holding them liable for all response costs already incurred but not reported by [the Government], as well as all future response costs that [the Government] may incur, in connection with the SIM site removal action." *Id.* at 30–31. Finally, the Court ordered that the Government "shall be allowed to recover its costs incurred in this action." *Id.* at 30.

Thereafter, Defendants filed a motion to amend the findings of fact and judgment entered by this Court regarding the length of the penalty period. Clerk's No. 203. The Government filed a response, to which Defendants replied. Clerk's Nos. 204, 208. The Court denied the motion, Clerk's No. 207, and Defendants appealed to the United States Court of Appeals for the Eighth Circuit. Clerk's No. 208.

On appeal, the Court of Appeals reversed and vacated the grant of summary judgment in favor of the Government on the question of arranger liability and vacated this Court's order with respect to any response costs "specifically associated with" its findings on that issue. *Dico*, 808 F.3d at 351. On the question of whether Dico violated the EPA Order, however, the Court of Appeals affirmed the grant of summary judgment in favor of the Government, concluding Dico necessarily violated paragraphs 31 and 59 of the order by allowing for the disassembly of buildings subject thereto and by failing to notify the EPA of the resulting change in conditions at the Dico site. *Id.* at 352–54, 355. Accordingly, the Court of Appeals affirmed the award of $10,000 in civil penalties to the Government for each of the 162 days it took to disassemble the buildings, concluding that Dico's failure to maintain the protection and integrity of the insulation encapsulation throughout the disassembly process constituted a continuing violation of the EPA Order. *Id.* at 352, 355.

Notwithstanding its affirmance of the civil penalties, the Court of Appeals reversed and vacated the punitive damages award based on the cleanup costs the Government had incurred at the SIM site. *Id.* at 352, 354–55. In so doing, the Court noted that the established violations of the EPA Order involved the *disassembly* of the buildings at the Dico site and the subsequent *failure* to notify the EPA of

this change in conditions, neither of which involved the *sale* of the buildings to SIM. *Id.* Based on this distinction, the Court concluded the cleanup costs the EPA incurred at the SIM site, which was contaminated following the *sale* of the buildings to SIM, could not serve as the basis of a punitive damages award based on the EPA Order violations, as those violations did not encompass the act of selling the buildings to SIM and resulted only from conduct involving the disassembly of the buildings and the subsequent failure to communicate this change in conditions to the EPA. *See id.* The appellate opinion did not address attorney fees. *See generally id.*

Now pending before this Court on remand are motions for partial summary judgment with respect to the issues of arranger liability, punitive damages, and the recoverability of attorney fees and other enforcement costs associated with prosecuting the EPA Order violations. Clerk's Nos. 235, 236. Also before the Court is a motion to exclude certain issues from trial on remand. Clerk's No. 246. For the reasons expressed herein, Defendants' motions for partial summary judgment are denied, and the Government's motion to exclude certain issues from trial on remand is granted in part and denied in part.

## II. THE SUMMARY JUDGMENT MOTIONS

Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Rule 56(a) mandates the entry of summary judgment upon motion after there has been adequate time for discovery "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The determination of whether summary judgment may be grant-

ed requires a court to view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences. *See id.*; *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).

"In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. Co.*, 536 F.3d 939, 943–44 (8th Cir. 2008) (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). Rather, the court determines only whether there are any disputed issues concerning the existence of material facts and, if so, whether those disputes are genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987). Summary judgment is appropriately entered against a party who has failed to make a showing sufficient to establish a genuine dispute as to the existence of an element essential to its case and upon which the party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, 106 S.Ct. 2548. When a summary judgment motion is filed, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings as well as any disclosures, discovery materials, or affidavits on file. Fed. R. Civ. P. 56(c); *see Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106

S.Ct. 2505. If the moving party has carried that burden, the nonmoving party may avoid summary judgment by going beyond its original pleadings to designate specific facts showing that there remains a genuine issue of material fact that must be resolved by a trial. *See* Fed. R. Civ. P. 56(c). A disputed issue is "genuine" when the evidence produced "is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The question of materiality, which turns on the substantive law, involves whether the dispute concerns relevant facts. *See id.*

### A. *Arranger Liability*

The CERCLA section governing "arranger liability" imposes strict liability for environmental contamination on

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). When arranger liability exists, it extends to "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." *Id.* § 9607(a).

■ "Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal." *Dico*, 808 F.3d at 346 (quoting *Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 907 (9th Cir. 2011)). In this case, the question of whether Defendants are subject to arranger liability turns on whether they "arranged for dis-posal" of a hazardous substance within the meaning of CERCLA. *See id.* at 346–51.

■ As the Court of Appeals noted in its opinion reversing the grant of summary judgment on this issue, to arrange something "implies action directed to a specific purpose." *Id.* at 346 (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009)). Thus, arranger liability plainly applies to any entity that participates in "a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." *Id.* (quoting *Burlington N.*, 556 U.S. at 609–10, 129 S.Ct. 1870). And arranger liability clearly does not apply to an entity that sells "a new and useful product" to a purchaser whose later disposal of the product "unbeknownst to the seller" leads to contamination. *Id.* (quoting *Burlington N.*, 556 U.S. at 610, 129 S.Ct. 1870). Cases falling between these two extremes include those in which an entity makes a "sale" with "some knowledge" that the buyer plans to dispose of a hazardous substance in the future or whose motives for a "sale" are "less than clear." *Id.* at 347 (quoting *Burlington N.*, 556 U.S. at 610, 129 S.Ct. 1870). In such cases, the determination as to whether an entity is subject to arranger liability involves "a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.* (quoting *Burlington N.*, 556 U.S. at 610, 129 S.Ct. 1870).

The Court of Appeals addressed at length in its opinion the significance of a seller having knowledge that selling a product will result in the eventual release of a hazardous substance in determining whether the seller had the requisite intent to be subject to arranger liability. In doing

so, the Court noted that "an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes." *Id.* (quoting *Burlington N.*, 556 U.S. at 612, 129 S.Ct. 1870). However, such knowledge is insufficient to establish arranger liability standing alone, "particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Id.* (quoting *Burlington N.*, 556 U.S. at 612, 129 S.Ct. 1870). Similarly, mere knowledge that the buyer of contaminated goods "would use only part of the contaminated goods and would discard part of the contaminated goods" is insufficient to establish arranger liability as a matter of law. *Id.* at 348. But the fact that a seller had knowledge a buyer would eventually dispose of hazardous wastes may constitute evidence of the seller's intent to dispose of those wastes. *See id.* at 348–49.

In reversing the grant of summary judgment on the arranger liability claim, the Court of Appeals acknowledged that an entity that enters into a transaction with knowledge concerning the eventual disposal of a hazardous substance is not subject to arranger liability if the transaction constitutes a "legitimate sale." *Id.* at 349. The Court further indicated that in determining whether a transaction constituted a legitimate sale, "the central question is the intent of the seller in the particular transaction." *See id.*

The Court of Appeals identified two key factors it found relevant to ascertaining the intent of seller who entered into a transaction with knowledge the inevitable disposal of a hazardous substance would result. *Id.* at 349–50. First, the Court determined "the usefulness of a product . . . is an important but not dispositive factor to consider in determining the seller's intent." *Id.* Second, the Court determined "the balance of the value received by the

seller compared to the cost avoided of having to address the proper disposal or remediation cost" also constitutes "a valid and important consideration" in discerning the seller's intent. *Id.* at 350. Importantly, however, the Court expressly acknowledged that an entity may sell a product that remains useful "with the full intention to rid itself of environmental liability rather than a legitimate sale" and noted that such intention might exist where the cost of disposal or contamination remediation greatly exceeded the purchase price. *Id.* at 349.

Ultimately, the Court of Appeals concluded, "the issue of Dico's intent should not have been decided at summary judgment." *Id.* at 351. More specifically, the Court concluded that both the usefulness of the buildings sold to SIM and the cost of remediating them to remove the hazardous materials they contained constituted genuine disputes regarding material facts precluding summary judgment. *Id.* at 350–51 & n.4. The Court thus vacated both the summary judgment order holding that Dico arranged for the disposal of hazardous substances as a matter of law and "the district court's order with respect to any response costs specifically associated with" the reversed holding on arranger liability. *Id.* at 351–52, 355.

Defendants now seek summary judgment on the question of arranger liability on two primary grounds. First, Defendants contend recent developments in the law demonstrate they are not subject to arranger liability as a matter of law because they legitimately intended to sell the buildings to SIM. Clerk's No. 235–2 at 6–7. Namely, Defendants claim recent caselaw demonstrates that the existence of arranger liability turns on whether the defendant legitimately intended to sell something. *Id.* Defendants thus argue that in this case, the "crucial question is . . .

whether Defendants legitimately sold something to SIM, regardless of whether the sale also involved disposal of peripheral materials." *Id.* at 8.

■ To the extent Defendants argue "undisputed facts" demonstrate they legitimately intended to sell the buildings to SIM, the Court disagrees. The Court notes most of the "undisputed facts" Defendants cite in support of the conclusion they seek remain in dispute.[2] Additionally, to the extent Defendants rely on older cases or cases from other circuits to support their argument that the law of arranger liability has shifted in their favor "in the ... years since motions for summary judgment were first filed ... in June 2012," *see* Clerk's No. 235–2 at 6–12, the Court notes the opinion of the Court of Appeals for this circuit, which was filed December 10, 2015, remains controlling authority. In fact, the cases chiefly relied upon by Defendants in support of this contention were cited by the Court of Appeals in its opinion reversing summary judgment.

■ More fundamentally, as the Government points out, for this Court to now grant summary judgment without a trial on the factual issues identified in that opinion would violate the mandate rule. *See* Clerk's No. 251 at 12–13. As previously recognized by the Court of Appeals, the mandate rule provides that a district court is bound by any decree issued by that court and "is without power to do anything which is contrary to either the letter or

spirit of the mandate construed in light of the opinion." *Pearson v. Norris*, 94 F.3d 406, 409 (8th Cir. 1996) (quoting *Thornton v. Carter*, 109 F.2d 316, 320 (8th Cir. 1940)). In this case, the Court of Appeals held summary judgment on the issue of arranger liability was precluded as a matter of law because genuine disputes of material fact exist with respect to the critical question of what Defendants intended. *Dico*, 808 F.3d at 350–51 & n.4. Because the Court of Appeals explicitly held that genuine issues of material fact preclude summary judgment on the question of arranger liability, this Court now lacks the power to grant summary judgment on this claim to either party.

Even assuming this Court had the power to grant summary judgment on the arranger liability claim, it would decline to exercise that power in favor of Defendants. In its opinion, the Court of Appeals concluded a necessary step in determining whether a transaction constitutes a legitimate sale foreclosing arranger liability or unlawful arranging for the disposal of a hazardous substance is discerning "the intent of the seller in the particular transaction." *Id.* at 349. Some facts Defendants recite in their brief, if true, arguably constitute circumstantial evidence of their intent with respect to the transactions in question here. But others appear irrelevant to determining what Defendants intended. For example, the fact that other parties were interested in purchasing the

2. The Court acknowledges at least two facts relied upon by Defendants in the section of their brief addressing arranger liability are undisputed. First, it is undisputed that Dico sold an unregulated portion of its Production Building to SIM in one of the three transactions upon which the arranger liability claim is based. *See* Clerk's No. 235–2 at 9. Second, it is undisputed that Dico sold its unregulated Weld Shop to SIM in 2004 in a transaction that involved the same terms as the transactions at issue. *Id.* at 8–9. But the Court concludes that some of the other "undisputed facts" recited by Defendants in this section of their brief are in fact vigorously disputed. Nonetheless, because the Court of Appeals concluded genuine disputes concerning material facts exist on the critical question of what Defendants intended with respect to the sale of the regulated buildings to SIM, *see Dico*, 808 F.3d at 350–51 & n.4, the Court need not address these disputes in order to rule on the pending motion for summary judgment with respect to arranger liability.

buildings sold to SIM does speak directly to the question of what *Defendants* intended. In addition, the fact that Defendants accepted substantial value for the buildings (or the steel beams they contained) does not indicate precisely what Defendants intended to accomplish by entering into these transactions.

As the Court of Appeals opinion makes clear, arranger liability turns on what Defendants intended with respect to each transaction as a whole:

> A party may sell a still "useful" product, i.e., fit either for its intended purpose or some other purpose useful to the buyer, with the full intention to rid itself of environmental liability rather than a legitimate sale, for example where the cost of disposal or contamination remediation would greatly exceed its purchase price (e.g., selling a working and useful piece of machinery for $10,000 that comes along with a $100,000 price tag for remediation costs). It appears to us that a seller who knew about the contamination in such a sale, if it can be shown the seller intended to arrange for its disposal because the seller knew the buyer would eventually dispose of it, could fall within the scope of the statute, even though the product may be considered "useful."

*Id.* Thus, the determination as to whether the sales to SIM constituted legitimate sales precluding arranger liability turns on what Defendants intended with respect to those sales as a whole. The mere fact that Defendants intended to sell something or sold something other than or in addition to the contaminated materials does not render the sales per se legitimate. *See id.*

Alternatively, Defendants argue they are not liable for arranging for the disposal of the PCBs in the buildings sold to SIM even if they intended to do so because there is an "insufficient nexus" between the response costs the Government in-

curred at the SIM site and the theory of arranger liability it advances with respect to that site. Clerk's No. 235–2 at 12–16. Because the Government incurred response costs only at the SIM site and not at the municipal landfill where SIM disposed of the PCB-laden insulation, Defendants claim the response costs the Government incurred arose only "as a peripheral consequence of the legitimate sale of the steel beams" such that they are not subject to liability for the response costs incurred at the SIM site. *Id.* at 14.

▮ The Court disagrees. Just as the question of whether a transaction is legitimate or not turns on the seller's intent with respect to the particular transaction as a whole, *see Dico*, 808 F.3d at 349, it is the seller's intent with respect to a particular transaction as a whole that defines the scope of arranger liability. In short, intent may transform the act of selling something that unintentionally results in the release of a hazardous substance into the unlawful act of intentionally arranging for the disposal of such a substance. Furthermore, "once it has been demonstrated that a party possessed the requisite intent to be an arranger, the party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site." *United States v. Cello–Foil Prod., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996). In other words, once it is determined that a party had the requisite intent to support arranger liability with respect to a particular transaction, that liability extends to all response costs causally connected to that transaction. The scope of arranger liability is not limited to response costs resulting from releases of hazardous substances the arranger specifically intended or anticipated. *See* § 9607(a)(3) (indicating arranger liability extends to "all costs of removal or remedial action incurred by the United States

Government ... not inconsistent with the national contingency plan").

Based on its analysis of the Court of Appeals opinion, the Court declines to grant summary judgment to Defendants with respect to arranger liability. The motion for partial summary judgment (Clerk's No. 235) is therefore DENIED as to the arranger liability claim.

## B. *Punitive Damages*

Section 9606(b)(1) provides, "Any person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any [EPA] order ... may ... be fined ... for each day in which such violation occurs or such failure to comply continues." "If any person who is liable for a release or threat of release of a hazardous substance fails without sufficient cause to properly provide removal or remedial action upon [such] order ... pursuant to section ... 9606 ..., such person may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred ... as a result of such failure to take proper action." *Id.* § 9607(c)(3).

On appeal, the Court of Appeals affirmed the award of civil penalties against Dico, concluding Dico violated paragraphs 31 and 59 of the EPA Order. *Dico*, 808 F.3d at 352–54. But the Court of Appeals vacated the award of punitive damages to the Government in an amount equal to the response costs it incurred at the SIM site, remanding the issue to this Court for further proceedings consistent with its opinion. *Id.* at 352, 354.

Defendants now ask this Court to enter summary judgment in their favor on the punitive damages claim, arguing the holding of the Court of Appeals completely forecloses any award of punitive damages to the Government. Clerk's No. 235–2 at 3–4. In doing so, Defendants argue CERC-LA does not authorize punitive damages awards on the basis of arranger liability

claims. *Id.* at 4. Defendant also rely heavily on statements in the Court of Appeals opinion emphasizing that punitive damage awards may be awarded under § 9607(a)(3) based only on costs incurred "as a result of" failing to take appropriate action in response to an EPA order. *Id.* at 3–5.

Though the Court of Appeals affirmed this Court's conclusion that Dico violated paragraph 31 of the EPA Order, it did so on a narrower ground than that articulated by this Court in its order awarding partial summary judgment on the question of whether Dico violated the EPA Order. *Compare* Clerk's No. 128 at 37, *with Dico*, 808 F.3d at 352. Whereas this Court concluded Dico violated paragraph 31 of the order "by arranging for the demolition of the buildings" subject thereto, Clerk's No. 128 at 37, the Court of Appeals concluded that Dico necessarily violated paragraph 31 merely by "allowing for the disassembly of the buildings" to take place in a manner that resulted in little bits of insulation being released into the environment, *Dico*, 808 F.3d at 352, 354.

Upon a close reading of the appellate opinion, it is evident that the distinction between the grounds upon which this Court and the Court of Appeals found Dico violated paragraph 31 of the EPA Order relates to the question of intent. Implicitly, the Court of Appeals concluded the same material fact disputes that preclude summary judgment on the question of whether Dico intentionally arranged for the disposal of PCBs also preclude summary judgment on the question of whether Dico violated paragraph 31 by doing so. The Court of Appeals nonetheless affirmed this Court on the question of Dico's liability for civil penalties under § 9606 because it determined Dico's "failure to maintain the protection and integrity of the encapsulation ... throughout the disassembly process

... constituted a continuing violation" of paragraph 31 regardless of what Dico intended. *Id.* at 354.

The Court of Appeals carefully considered the precise grounds upon which it had determined Dico violated the EPA Order in determining whether to affirm the punitive damages award, questioning in particular whether the costs upon which that award was based were costs the Government had incurred "as a result of" the EPA Order violations established in the summary judgment record. *See id.* The Court determined that none of the costs the Government incurred at the SIM site constituted costs incurred "as a result of" the disassembly of the buildings or Dico's failure to notify the EPA of the resulting changed conditions at the Dico site. *Id.* Rather, it noted, the cleanup costs the Government incurred at the SIM site "arose after SIM purchased the beams from Dico and transported them from the teardown site to the SIM site." *Id.* Thus, the Court concluded "all of these cleanup costs arose as a result of Dico's sale of the beams to SIM." *Id.*

Having affirmed the grant of summary judgment on the question of whether Dico violated the EPA Order based on acts that did not "result" in the costs the Government incurred at the SIM site, the Court of Appeals vacated the summary judgment award of punitive damages based on those costs. *Id.* at 354–55. In doing so, the Court stated,

> Dico might ultimately be found liable under a theory of arranger liability for its sale of the beams to SIM, but at this point a fact question remains that precludes summary judgment on arranger liability. So too with punitive damages. The cleanup costs at the SIM site derive from Dico's sale of the beams to SIM. Therefore, since we cannot say as a matter of law Dico is liable for arranging for the disposal of the beams it sold to

SIM, nor can we say as a matter of law it is liable (through punitive damages) for the cleanup costs the Fund incurred at the SIM site as a result of the sale of the beams to SIM. Our holding that the district court improperly granted summary judgment on the issue of arranger liability necessarily requires us to reverse the district court's award of punitive damages based on cleanup costs at the SIM site.

*Id.* at 354–55. Thus, the Court made clear that genuine disputes as to material facts precluded holding Defendants liable for punitive damages based on costs the Government incurred at the SIM site at the summary judgment stage. *See id.*

Defendants argue the opinion of the Court of Appeals "leaves nothing for this Court to do except enter judgment" in their favor on the punitive damages claim. Clerk's No. 235–2 at 4. Defendants rely primarily on two assertions to support their position. First, Defendants contend the Court of Appeals opinion completely forecloses the conclusion that the Government incurred any costs "as a result of" Dico violating the EPA Order. *Id.* Second, Defendants contend that because CERCLA does not authorize punitive damages awards in the context of arranger liability claims, the Government did not request punitive damages in connection with its claim that Defendants arranged for the disposal of PCBs. *Id.* at 5.

■ Even assuming Defendants are correct that CERCLA does not authorize punitive damages awards in the context of arranger liability claims, the Court disagrees with Defendants' conclusion that the Court of Appeals opinion compels summary judgment in their favor. The Government does not seek punitive damages merely on the ground that Defendants arranged for the disposal of a hazardous substance, but on the ground that Defen-

dants violated the terms and conditions of the EPA Order by doing so. In the Complaint, the Government clearly alleged that Dico violated the EPA Order "by arranging for the demolition of Buildings 3, 4, and 5 on the Dico property and thereby arranging for the breach of the encapsulation of the insulation without notifying EPA and complying with the requirements of its Operation and Maintenance Plan." *See* Clerk's No. 1 at 13. Additionally, the Government linked its request for punitive damages to this specific allegation. *See Dico*, 808 F.3d at 354. Nothing in the Court of Appeals opinion precludes the Government from proving this theory of violation at trial. For example, the Court of Appeals did not hold that arranging for the disposal of the PCBs by means of selling the buildings to SIM would not have constituted a violation of the EPA Order as a matter of law.

Fundamentally, as the Court of Appeals opinion makes clear, the availability of punitive damages in this case turns on their causal connection to the specific conduct constituting a failure to comply with the EPA Order. *Id.* at 354. At a minimum, Dico violated the EPA Order by violating paragraphs 31 and 59 in the manner described by the Court of Appeals. *Id.* at 352–54. However, nothing in the Court of Appeals opinion forecloses the Government from proving that Dico also violated the order by intentionally arranging for the disposal of the PCBs the buildings contained by means of selling the buildings to SIM. On the contrary, the opinion clearly anticipates that if Defendants are liable for arranger liability, liability might also exist with respect to punitive damages. *Id.* ("So too with punitive damages."). If Dico intentionally arranged for the disposal of the PCBs by entering into contracts with SIM requiring the demolition of the buildings subject to the EPA Order, that conduct would certainly constitute a violation of the terms of paragraph 31 of the order, which "required Dico to maintain and protect the integrity of the sealing and encapsulation of the building insulation." *Id.* at 352. If the Government proves Defendants arranged for the disposal of PCBs by means of the transactions transferring ownership of the beams to SIM, it will have established the causal connection required to support an award of punitive damages based on the costs it incurred at the SIM site. Accordingly, if the Government proves at trial that Defendants arranged for the disposal of the PCBs by selling the beams to SIM, this Court may award punitive damages to the Government based on the costs it incurred at the SIM site, which the Court of Appeals determined arose "as a result of" that sale. *Id.* at 354.

The Court notes the disposition of the Court of Appeals with respect to the punitive damages award confirms its conclusion. Had the Court of Appeals intended its resolution of the appeal of the punitive damages award to require this Court to enter judgment in Defendants' favor on the punitive damages claim, it would have remanded the case with instructions to do so. Instead, the Court of Appeals remanded for further proceedings consistent with its opinion. *Id.* at 355. If the Court of Appeals opinion required this Court to grant summary judgment on the punitive damages claim, holding further proceedings on this issue would be inconsistent with that mandate. Instead, the opinion makes clear that genuine disputes as to material facts relevant to the Government's ability to collect punitive damages remain. *Id.* at 354 ("Dico might ultimately be found liable under a theory of arranger liability for its sale of the beams to SIM, but at this point a fact question remains that precludes summary judgment on arranger liability. So too with punitive damages."). The mandate rule obligates this Court to permit the parties to resolve those factual disputes at trial. *See id.* at 355.

Based on its interpretation of the mandate of the Court of Appeals and its obligation to carry the letter and spirit of that mandate into effect, the Court concludes the Government may pursue punitive damages on the theory that Dico violated the EPA Order by arranging for the disposal of the PCBs by selling the buildings subject thereto to SIM. Therefore, the motion for partial summary judgment (Clerk's No. 235) is DENIED as to the punitive damages claim.

### C. Attorney Fees and Other Enforcement Costs

The scope of liability applicable to persons who qualify as arrangers under § 9607(a) is specified therein. "Notwithstanding any other provision or rule of law" and subject to only specified defenses, arranger liability under § 9607(a) extends to "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan." The Court of Appeals has previously interpreted this language as creating a "conclusive presumption" that attorney fees and other enforcement costs incurred by the Government are reasonable and recoverable so long as they are not inconsistent with the national contingency plan ("NCP") whenever § 9607(a) liability exists. *See United States v. Dico, Inc.*, 266 F.3d 864, 877–79 (8th Cir. 2001). This conclusion is consistent with the language of 42 U.S.C. § 9601(25), which provides that the terms "removal" and "remedial action" include "enforcement activities related thereto."

In contrast, the scope of liability applicable to any person who "willfully violates, or fails or refuses to comply with" an EPA order in violation of § 9606(b) is only partially addressed in that subsection of CERCLA. Specifically, as previously noted, § 9606(b) provides such persons "may . . . be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues." Additionally, § 9607(c)(3) states that "any person who is liable for a release or threat of release of a hazardous substance [and] fails without sufficient cause to properly provide removal or remedial action upon order . . . pursuant to section . . . 9606 . . . may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred . . . as a result of such failure to take proper action."

Defendants now seek partial summary judgment as to the recoverability of attorney fees and other costs the Government incurred in prosecuting Dico for violating the EPA Order. Clerk's No. 236 at 1–2. Specifically, Defendants request a ruling that attorney fees or other enforcement costs attributable solely to the Government's claims for civil penalties and punitive damages based on Dico violating the EPA Order are not recoverable as a matter of law. Clerk's Nos. 236 at 2, 236–2 at 4–8. Defendants contend such unrecoverable costs include all attorney fees or other enforcement costs the Government incurred between approximately September 24, 2012 (the date this Court granted summary judgment in favor of the Government on the arranger liability claim) and May 22, 2014 (the date this Court denied Dico's motion to amend its findings of fact and judgment regarding the length of the penalty period associated with the EPA Order violations).[3] Clerk's Nos. 236 at 2, 236–2 at

---

**3.** In their brief in support of the motion for summary judgment on this issue, Defendants assert unrecoverable costs incurred by the Government include but are not limited to all attorney fees and other enforcement costs in-

curred between September 24, 2012, and May 22, 2014. Clerk's No. 236–2 at 13. In their reply brief, however, Defendants concede that at least some of the attorney fees and other

1–3, 8. Defendants further claim that such attorney fees and costs are not recoverable as a matter of law even if Defendants are found liable as arrangers under § 9607(a)(3) because the Government may not use its arranger liability claim as a basis for recovering otherwise unrecoverable attorney fees and enforcements costs incurred in prosecuting the violation of the EPA Order. Clerk's Nos. 236 at 2, 236–2 at 3, 4–8. Finally, Defendants advance an alternate theory in requesting that the Court hold the Government may not recover attorney fees and enforcement costs incurred in prosecuting the EPA Order violations from Titan Tire, as Titan Tire was not a party to the EPA Order and therefore was not named as a defendant in the Government's claims seeking civil penalties and punitive damages based on the EPA Order violations. Clerk's No. 236–2 at 1, 5 n.3, 256–2 at 12–13; *see also* Clerk's No. 256–1 at 10.

In response, the Government contends the law of the case doctrine bars Defendants from litigating the recoverability issue now, as this Court previously ruled on two occasions that all response costs the Government incurred "in connection with the SIM site removal action" would be recoverable. Clerk's No. 252 at 11–22; *see* Clerk's Nos. 128 at 16–17, 198 at 30 & n.50. The Government also contends that Defendants waived the argument that attorney fees and costs related solely to the enforcement of the EPA Order are not recoverable as a matter of law by failing to raise to timely raise it. Clerk's No. 252 at 14–15. Alternatively, the Government asserts that if Defendants are found liable as arrangers, that liability extends to any attorney fees and costs the Government incurred in prosecuting the EPA Order violations because § 9607(a) liability extends to "all costs of removal or remedial action

incurred by the United States Government ... not inconsistent with the national contingency plan." *Id.* at 15–21. According to the Government, Titan Tire may therefore be held liable for all response costs incurred, as CERCLA liability for response costs is joint and several unless a defendant seeking to avoid such liability demonstrates a reasonable basis for apportionment exists. *Id.* at 21–22. Finally, the Government argues that holding Defendants jointly and severally liable for all response costs the Government incurred is appropriate because the claims the Government advances contain overlapping elements of proof based on a common core of facts, *id.* at 24 & n.7, and because Titan Tire must be imputed with the knowledge and intent of its own officers and employees, Clerk's No. 264 at 5–6.

 "The doctrine of the law of the case ... is a doctrine of discretion and provides that when a court decides a rule of law, that decision should govern the same issues in subsequent stages in the same case." *Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1139 (8th Cir. 2007) (alteration in original) (quoting *UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir.1995)). When the doctrine applies, it "generally requires that a decision on a former appeal be followed in any subsequent proceedings in that court or a lower court unless evidence subsequently introduced is substantially different or the decision is clearly erroneous and works manifest injustice." *In re Progressive Farmers Ass'n*, 829 F.2d 651, 655 (8th Cir. 1987). Application of the doctrine is limited to those issues that were "actually decided ... in the prior stages of a case." *Roth v. Sawyer–Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995). The doctrine is thus inapplicable to dicta. *United States v. Bloate*, 655 F.3d 750, 755 (8th Cir. 2011).

enforcement costs the Government incurred during this period were not attributable solely to its prosecution of the EPA Order violations. *Id.* at 12 n.5.

 The law of the case doctrine applies to both "decisions made by appellate courts and final decisions made by district courts." *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 830 (8th Cir. 2008) (citing *First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 620 (8th Cir.2007)). When "an appellate court remands a case to the district court, all issues decided by the appellate court become the law of the case, and the district court on remand must 'adhere to any limitations imposed on its function ... by the appellate court.'" *United States v. Castellanos*, 608 F.3d 1010, 1016 (8th Cir. 2010) (alteration in original) (quoting *United States v. Cornelius*, 968 F.2d 703, 705 (8th Cir. 1992)). Likewise, past district court decisions that "either have not been appealed or have been appealed and affirmed[ ] are the law of the case and need not be revisited." *Liddell by Liddell v. Bd. of Educ. of the City of St. Louis*, 121 F.3d 1201, 1216 (8th Cir. 1997). Conversely, however, the doctrine is inapplicable to a vacated opinion of the district court, as a vacated opinion has no further force or effect. *Creighton v. Anderson*, 922 F.2d 443, 449 (8th Cir. 1990); *see Johnson v. Bd. of Educ. of City of Chicago*, 457 U.S. 52, 53–54, 102 S.Ct. 2223, 72 L.Ed.2d 668 (1982).

In this case, the determination of what constitutes the law of the case requires careful evaluation of the Court of Appeals opinion and its effect with respect to the relevant prior order of this Court. In particular, the Court begins its analysis by considering whether the Court of Appeals vacated its grant of summary judgment to the Government concerning the recoverability of its response costs.

In June 2012, the Government filed a motion seeking summary judgment as to the recoverability of all its response costs under § 9607(a), which entitles the Government to recover "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan" following "a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." *See generally* Clerk's Nos. 63, 63–1. The question of whether the Government would be entitled to recover all the response costs it incurred as a matter of law in the event Defendants were found liable as arrangers under §. 9607(a) was extensively briefed by the parties. *See generally* Clerk's Nos. 63, 63–1, 70, 74, 94, 96, 122, 123.

In August 2012, counsel for both parties presented oral argument on the motion to the Court. Clerk's No. 93 at 111–30. During that proceeding, counsel for the Government emphasized it sought a ruling that specific categories of costs it incurred, including attorney fees and other enforcement costs related to the present action seeking cost recovery and penalties, were recoverable under § 9607(a) as a matter of law as well as a ruling that the costs it had previously incurred were consistent with the NCP. *Id.* at 114, 117. Counsel for the Government further noted Defendants had not challenged its assertions regarding the recoverability of specific categories of costs in the context of § 9607(a) liability. *Id.* at. 117. During the same proceeding, defense counsel confirmed that Defendants' position was that the response costs the Government incurred were inconsistent with the NCP because the response actions that resulted in those costs were arbitrary and capricious. *Id.* at 125–26. In supplemental briefing on the issue submitted after oral argument, Defendants did not present any of the arguments they raise on remand concerning the recoverability of attorney fees and other costs related to the prosecution of the claims for civil penalties and punitive damages based on the alleged violations of the EPA Order. *See generally* Clerk's Nos. 94, 123.

In March 2013, the Court issued an order granting the Government's motion for partial summary judgment on the recoverability of its response costs. *See generally* Clerk's No. 128. In that order, the Court noted Defendants did not dispute that the response costs the Government incurred were "generally recoverable nor their amounts." *Id.* at 17. After reviewing the relevant CERCLA provisions and caselaw, the Court concluded that all response costs the Government incurred, including its attorney fees and other enforcement costs, were recoverable under § 9607(a) as a matter of law so long as they were not inconsistent with the NCP. *Id.* at 16–18. The Court next considered the parties' arguments as to whether the response actions taken by the Government were inconsistent with the NCP and concluded they were not. *Id.* at 17–31, 41.

Notably, months prior to the date this Court entered its order granting summary judgment on the recoverability of response costs, in September 2012, the Court issued an order granting summary judgment to the Government on the question of arranger liability. *See generally* Clerk's No. 119. Consequently, in the order granting partial summary judgment to the Government as to the recoverability of its response costs, the Court not only addressed the recoverability of particular categories of costs generally as a matter of law, but also stated a specific holding with respect to Defendants' liability for response costs the Government had already incurred or would incur in the future in light of its prior holding on the issue of arranger liability. Clerk's No. 128 at 43. More precisely, the Court concluded "Defendants are liable for

all response costs that [the Government] has already incurred or will incur as a result of the SIM site removal action." *Id.*

With this backdrop in place, the Court considers the implications of the opinion issued on Defendants' appeal from the judgment entered against them and the order denying the motion to amend it with respect to the law of the case on remand. In its opinion, the Court of Appeals vacated (1) this Court's order holding that Defendants arranged for the disposal of hazardous substances as a matter of law, (2) its order as to response costs "specifically associated with [its] finding on the issue of 'arranger' liability," and (3) its award of punitive damages to the Government. *Dico.* 808 F.3d at 351, 352, 354–55. In the same opinion, the Court of Appeals affirmed this Court's "orders with respect to the EPA Order violations and civil penalties" and its award of civil penalties to the Government. *Id.* at 352, 354, 355.

 As previously noted, a rule of law contained in a vacated district court opinion does not constitute the law of the case, as such opinions have no further force or effect. *Creighton,* 922 F.2d at 449. Accordingly, if the Court of Appeals had vacated the March 2013 order in its entirety, any conclusions of law contained therein would no longer be the law of the case. It is apparent the Court of Appeals did not do so, however, as its opinion specifically affirmed the March 2013 order with respect the question of whether Dico violated the EPA Order. Instead, the Court of Appeals vacated the March 2013 order only insofar as it awarded "response costs specifically associated with [this Court's] finding on the issue of 'arranger' liability." *Dico,* 808 F.3d at 351.[4] Moreover, nothing in the

4. The parties' stipulation regarding the scope of the trial required on remand is consistent with this conclusion, as the parties agree that the response actions by which the Government incurred response costs as a result of

the release of hazardous substances at the SIM Site were not inconsistent with the NCP. *See* Clerk's No. 245. The Court so held in the March 2013 opinion. Clerk's No. 128 at 17–31, 43.

Court of Appeals opinion undermines in any way the rule of law articulated by this Court in the March 2013 order concerning the recoverability of costs incurred by the Government in the context of a successful arranger liability claim brought under § 9607(a). Therefore, the Court concludes the rule of law it articulated in that opinion constitutes the law of the case with respect to this question on remand.

■ Even assuming the law of the case does not apply, however, the Court rejects Defendants' argument that a successful arranger liability claim under § 9607(a) may not serve as a basis for recovering attorney fees and other enforcement costs incurred in bringing an enforcement action under § 9606(b). *See* Clerk's No. 236–2 at 5, 8. The unambiguous text of § 9607(a) provides that a person who arranges for the disposal of a hazardous substance shall be liable for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." Furthermore, it expressly provides for the situation in which more than one CERCLA section is violated through its inclusion of the phrase "[n]otwithstanding any other provision or rule of law." Because it includes this phrase, the introductory text to § 9607(a) indicates that where liability exists on another basis, so long as there is also liability under § 9607(a), that liability extends to *all* costs incurred by the Government that constitute "costs of removal or remedial action ... not inconsistent with the national contingency plan." *See United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1274 (3d Cir. 1993) (holding costs incurred in a "removal action" are recoverable under § 9607(a), even if that action was pursued by invoking a statutory scheme other than CERCLA), *overruled in other part by United States v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161 (3d Cir. 2005).

When the EPA issues an order under § 9606(a), it invokes its statutory authority to issue "such orders as may be necessary to protect public health and welfare and the environment." Section 9606(b) provides a means by which the Government may "enforce such order[s]" by prosecuting claims for civil penalties. Considered in light of the statutory authority for orders the Government may enforce pursuant to § 9606(b), it is evident that prosecuting any claim for civil penalties under § 9606(b) constitutes an enforcement activity related to a removal or remedial action within the meaning of CERCLA. *See* § 9601(25) ("The terms 'respond' or 'response' mean[ ] remove, removal, remedy, and remedial action;[ ] all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto."); *see also* § 9601(23) ("The terms 'remove' or 'removal' mean[ ] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release...."); § 9601(24) ("The terms 'remedy' or 'remedial action' mean[ ] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment...."). In this circuit,

established precedent indicates that attorney fees and other enforcement costs incurred by the Government are recoverable as costs of removal or remedial actions because they are "enforcement activities related thereto." *Dico*, 266 F.3d at 878.[5]

For these reasons, the motion for partial summary judgment (Clerk's No. 236) is DENIED as to attorney fees and other enforcement costs the Government incurred in prosecuting Dico's violation of the EPA Order. If the Government proves Defendants are liable as arrangers within the meaning of § 9607(a) on remand, Defendants will be jointly and severally liable for all response costs the Government incurred in this action that are not inconsistent with the NCP, including attorney fees and other enforcement costs it incurred pursuing its claims based on § 9606(b). *See Burlington N.*, 556 U.S. at 614–15, 129 S.Ct. 1870 (holding that defendants seeking to avoid joint and several liability under § 9607(a)(3) "bear the burden of proving that a reasonable basis for apportionment exists"). Alternatively, if the Government does not prove at trial that Defendants arranged for the disposal of a hazardous substance within the meaning of § 9607(a), the Court will permit the parties to submit arguments concerning the following issues: (1) the appropriateness of awarding the Government attorney fees and other enforcement costs incurred in pursuing its successful claim for civil penalties under § 9606(b) in the absence of a successful arranger liability claim; (2) the appropriateness of holding Titan Tire liable for attorney fees and other enforcement costs the Government

incurred pursuing its successful claim for civil penalties under § 9606(b) against Dico in the absence of a successful arranger liability claim against all Defendants; and (3) whether and to what degree the successful claim for civil penalties under § 9606(b) and the unsuccessful claims for arranger liability and punitive damages were based on a common core of facts and related legal theories such that they were inextricably intertwined. In short, because the Court granted summary judgment to the Government on the arranger liability claim months before it issued the March 2013 order addressing the recoverability of the response costs as a matter of law, it never actually decided these issues. Therefore, the law of the case doctrine is inapplicable with respect to them. *See Roth*, 61 F.3d at 602 ("Law of the case applies only to issues actually decided, either implicitly or explicitly, in the prior stages of a case.").

### III. THE MOTION EXCLUDE CERTAIN ISSUES FROM TRIAL ON REMAND

In its motion seeking to exclude certain issues from trial on remand, the Government asks this Court to order the parties to exclude from presentation at trial all argument, evidence, opinion, and testimony related to (1) the origin of the PCBs found at the SIM Site and (2) the question of whether response actions taken by the Government were consistent with the NCP. Clerk's Nos. 246 at 1, 246–1 at 3. With respect to the origin issue, the Government bases its request on the law of

---

**5.** In arguing that attorney fees and other enforcement costs incurred by the Government in prosecuting a claim under § 9606(b) are not recoverable as a matter of law, Defendants rely primarily on the United States Supreme Court's decision in *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). *See* Clerk's No. 236–

2 at 6–8. However, *Key Tronic* "offers little guidance" with respect to the recoverability of attorney fees incurred by the Government under CERCLA, as the case concerned only the recoverability of response costs in a private action to recover cleanup costs. *Dico*, 266 F.3d at 878 n.12 (citing *Key Tronic*, 511 U.S. at 819, 114 S.Ct. 1960).

the case and its corollary, the mandate rule. Clerk's No. 246–1 at 7–11, 12–14. In the alternative and with respect to the consistency of the response actions, the Government argues that Defendants failed to preserve this issue on appeal. *Id.* at 8, 11–12, 16.

Defendants argue the Court must deny the motion to exclude on the ground that the Court of Appeals issued a "general remand" as opposed to a "limited remand" explicitly outlining the issues to be addressed and creating a narrow framework within which this Court must operate. Clerk's No. 267 at 6–7 (quoting *United States v. Campbell*, 169 F.3d 263, 265 (6th Cir. 1999)). Because the Court of Appeals vacated the finding on arranger liability in its entirety, Defendants further urge that this Court must consider all factual issues related to intent anew, including the origin issue and the related issue of knowledge. *Id.* at 7.

▮▮▮ "A corollary to the principle that a mandate is completely controlling as to all matters within its compass is the rule that, upon a reversal and remand for further consistent proceedings, the case goes back to the trial court for a new determination of the issues presented as though they had not been determined before, pursuant to the legal principles enunciated in the appellate court's opinion, which must be taken as the law of the case." *Poletti v. C.I.R.*, 351 F.2d 345, 347 (8th Cir. 1965); *see also Republican Party of Minnesota v. White*, 416 F.3d 738, 745 (8th Cir. 2005) (quoting *Poletti*, 351 F.2d at 347). Thus, even "when a case has been ... remanded for further proceedings, every question decided by the appellate court, whether expressly or by necessary implication, is finally settled and determined, and the court on remand is bound by the decree and must carry it into execution ...." *Thompson v. C.I.R.*, 821 F.3d 1008, 1011 (8th Cir. 2016). "Questions nec-

essarily involved in the decision on a former appeal will be regarded as the law of the case ..., although the questions are not expressly treated in the opinion of the court, as the presumption is that all the facts in the case bearing on the points decided have received due consideration whether all or none of them are mentioned in the opinion." *Pyramid Life Ins. Co. v. Curry*, 291 F.2d 411, 413 (8th Cir. 1961) (quoting 5B C.J.S. *Appeal and Error* § 1832). Thus, the mere fact that an appellate court issued a general remand or a remand for proceedings consistent with its opinion in no way negates the authority of a district court to apply the law of the case with respect to issues implicitly or necessarily addressed therein. *See Castellanos*, 608 F.3d at 1017; *see also Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 456 (8th Cir. 1990). Rather, in determining what questions were actually or necessarily decided, "records on a former appeal may be looked into for the purpose of ascertaining what facts and questions were then before the court, so as to see the correct application of the rule." *Pyramid Life*, 291 F.2d at 413 (quoting 5B C.J.S. *Appeal and Error* § 1832).

## A. The Origin Issue

As previously noted, the Court of Appeals vacated the order of this Court holding that Defendants arranged for the disposal of hazardous substances as a matter of law, the award of specific response costs to the Government, and the punitive damages award. *Dico.* 808 F.3d at 351, 352, 354–55. In the section of its opinion devoted to arranger liability, the Court of Appeals also identified two genuine disputes as to material facts that precluded summary judgment on the issue of intent—the usefulness of the regulated buildings sold to SIM and the cost of remediating them to remove the PCBs they contained. *Id.* at 351–52 & n.4. At the close of the section of

the opinion devoted to punitive damages, the Court stated that the punitive damages award was remanded for further proceedings consistent with its opinion. *Id.* at 355. No other section of the opinion stated any explicit limitation concerning the scope of the proceedings to take place on remand. *See generally id.*

In a separate section of the opinion, the Court of Appeals affirmed the award of civil penalties to the Government. *Id.* at 345, 352. In that section of the opinion, the Court explicitly indicated that although Dico had asserted "four factual issues precluded the imposition of civil penalties" at summary judgment on appeal, the panel majority concluded "no triable issues relevant to the civil penalties" precluded summary judgment. *Id.* at 353.

On remand this Court is bound to follow the letter and spirit of the mandate construed in light of the opinion issued by the Court of Appeals. *Pearson*, 94 F.3d at 409 (quoting *Thornton*, 109 F.2d at 320). This requires the Court to treat as finally determined "every question decided by the appellate court, whether expressly or by necessary implication." *Thompson*, 821 F.3d at 1011. Accordingly, the Court now must determine whether the origin issue was actually decided by the Court of Appeals, whether expressly or by necessary implication.

 As elsewhere discussed in this Order, after careful examination of the Court of Appeals opinion, the Court concludes the import of the consistency language in the punitive damages section is that the Government may establish a causal connection between the costs it incurred at the SIM site and specific conduct constituting a failure to comply the EPA Order sufficient to support a punitive damages award by proving that Defendants are liable as arrangers based on their sale of the beams to SIM on remand. The Court notes the Court of Appeals repeatedly and ex-

plicitly indicated that the cleanup costs the Government incurred at the SIM site resulted from the sale of the beams to SIM. *Dico.* 808 F.3d at 354. As such, the Court of Appeals necessarily agreed with this Court that at least some of the PCBs discovered at the SIM site originated in the buildings Dico sold to SIM. Because the Court of Appeals remanded the case with instructions to hold further proceedings consistent with its opinion in the very section of the opinion in which it articulated its determination with respect to the origin issue, this Court concludes the Court of Appeals's determination with respect to that issue constitutes the law of the case on remand. *See Poletti*, 351 F.2d at 347 (indicating that upon remand for further consistent proceedings, an issue must be determined anew "pursuant to the legal principles enunciated in the appellate court's opinion"); *see also UniGroup*, 45 F.3d at 1211 (noting an appellate determination as to the propriety of a grant of summary judgment may implicitly affirm a district court determination as to a subsidiary factual question).

A close examination of other aspects of the appellate opinion in conjunction with the record on appeal reinforces this conclusion. In particular, the statement in the opinion finding that "no triable issues relevant to the civil penalties ... imposed" exist also indicates the origin issue was actually decided on appeal when read in conjunction with the preceding sentence. *Dico.* 808 F.3d at 352. The statement itself constitutes a conclusion of law, and the preceding sentence ties that conclusion to specific positions asserted by Dico on appeal. An examination of appellate record reveals that Dico argued on appeal that a factual dispute with respect to the origin issue precluded the imposition of both civil penalties and punitive damages at summary judgment, insisting that the question of whether PCBs already at the SIM site

could have contaminated the beams was a disputed material fact. *See Brief of Appellants* at 62–66, *United States v. Dico*, 808 F.3d 342 (8th Cir. 2014), No. 14-2762, 2014 WL 6671061 at *62–66. By explicitly finding that no triable issues existed with respect to the imposition of civil penalties and connecting that finding to the position Dico asserted on appeal with respect to the origin of the PCBs at the SIM site, the Court of Appeals implicitly rejected that position.[6]

Furthermore, the Court rejects Defendants' assertion that another statement in the appellate opinion dictates a contrary conclusion. Specifically, Defendants argue the acknowledgment that the EPA "had no way of tracing the specific origin of the PCBs and could not confirm whether the steel beams came from Dico's buildings that were subject to the EPA Order" in the factual background section of the opinion requires this Court to conclude the Court of Appeals decided the origin issue in their favor. Clerk's No. 268 at 2, 8 (quoting *Dico*, 808 F.3d at 346). The Court rejects this assertion, as the statement in question merely amounts to a recitation of one neutral fact relevant to the origin issue, not a causal conclusion.[7]

Finally, the Court rejects Defendants' suggestion that any implicit determination the Court of Appeals made as to the origin issue cannot constitute the law of the case because it is material to determining their intent on remand. *See* Clerk's No. 267 at 7–8. Defendants assert they cannot have intended to dispose of PCBs at the SIM site if the only PCBs discovered there came from sources of which they were unaware. But arranger liability turns on what Defendants intended with respect to the PCBs they knew or reasonably should have known to be in the buildings sold to SIM, because the question is whether they intentionally arranged for the disposal of PCBs originating at the Dico site. And the Court of Appeals explicitly concluded that "Dico's argument that it could reasonably believe no PCBs actually remained in the buildings after its initial remediation work" was "meritless." *Dico*, 808 F.3d at 353. This legal conclusion was explicitly relied upon by the Court of Appeals in affirming the civil penalties award and is binding on remand. *See id.*

Because the Court of Appeals necessarily determined the origin issue and this Court is bound to honor the letter and spirit of its mandate construed in light of its opinion, the Court concludes application of the law of the case doctrine is appropriate with respect to this issue. *See Pearson*, 94 F.3d at 409. Defendants neither allege that they have uncovered substantially different evidence on this question nor allege that the appellate decision is clearly erroneous and works a manifest injustice. *See, e.g., Maxfield*, 487 F.3d at 1135; *Progressive Farmers*, 829 F.2d at 655. Therefore, the motion to exclude certain issues from trial on remand (Clerk's No. 246) is GRANTED as to the origin issue, and the parties are barred from presenting at trial any argument, evidence, opinion, and testimony as to the origin of the PCBs discovered at the SIM site.

6. The Court acknowledges the Government was not necessarily required to prove a hazardous substance was released at the Dico site and transported to the SIM site in order to establish Dico's liability under § 9606(b). At a minimum, however, the conclusion that no triable issues existed confirms that the Court of Appeals considered and rejected the assertion Dico made with respect to a subsidiary aspect of the origin issue, i.e., materiality.

7. This Court recounted the same fact in reciting the relevant background in its order granting summary judgment to the Government on the issue of arranger liability. Clerk's No. 119 at 8.

## B. Whether the Government's Response Actions Were Consistent with the NCP

The Government's motion to exclude certain issues on remand also asks this Court to exclude from presentation at trial all argument, evidence, opinion, and testimony related the question of whether the response actions taken by the Government were consistent with the NCP. Clerk's Nos. 246 at 1, 246–1 at 3. In their opposing briefs on the motion, however, the parties frequently focus on a related, but distinguishable, legal issue—the recoverability of response costs incurred under § 9607(a). That issue is considered in section II.C of this Order, which addresses the motion for summary judgment as to the recoverability of attorney fees and other enforcement costs incurred by the Government. Therein, this Court concludes the rule of law articulated in its March 2013 order concerning the recoverability of costs incurred by the Government in the context of a successful arranger liability claim brought under § 9607(a) constitutes the law of the case.

In resisting the motion to exclude, Defendants concede that they "did not appeal the issue of whether the government's response actions were inconsistent with the National Contingency Plan." Clerk's No. 267 at 13. But Defendants contest the Government's assertion that they have "waived any right to challenge certain costs the government seeks to recover, including legal fees and costs the government incurred in trying a case against Dico only for violating an EPA order." Id. In construing the arguments submitted by the parties on this issue, the Court finds instructive the parties' stipulation regarding the scope of the trial on remand. Paragraph (d) of the stipulation indicates that Defendants do not concede that "the response costs occurred as a result of the theory of arranger liability alleged against Defendants" or "that all of the response costs are recoverable against each Defendant even if the government prevails on its arranger liability theory." [8] Clerk's No. 245 at 2. The same paragraph states, "Defendants further contend that they may challenge the issue of consistency with the National Contingency Plan with respect to any costs disclosed after the date on which summary judgment was granted on the government's motion for summary judgment regarding consistency with the National Contingency Plan." Id.

As previously noted, this Court addressed the consistency of the Government's response actions with the NCP in its March 2013 order, and it is apparent that the Court of Appeals did not vacate that order in its entirety. Therefore, the Court concludes that ruling remains intact as the law of the case with respect to all response actions disclosed prior to the issuance of the March 2013 order. [9] Defendants have waived their ability to challenge the ruling of this Court with respect to the consistency with the NCP of response costs originating from response actions disclosed prior to that time.

 Accordingly, the motion to exclude certain issues from trial on remand (Clerk's No. 246) is GRANTED IN PART with respect to the issue of whether the Government's response actions were inconsistent with the NCP. To the extent the Government seeks to exclude the presentation at trial of any argument, evidence,

---

8. The Court notes that its rulings in sections II.B and II.C of this Order address these issues.

9. Defendants do not dispute that the consistency of response costs the Government incurred with the NCP turns on whether the Government's response actions were consistent with the NCP. See Clerk's No. 267 at 13.

opinion, and testimony for the sole purpose of challenging the consistency with the NCP of response costs originating from response actions disclosed prior to the issuance of the March 2013 order, the motion is granted. As noted in section II.C of this Order, if the Government proves Defendants are liable as arrangers within the meaning of § 9607(a), Defendants will be jointly and severally liable for all response costs the Government incurred in this action, including attorney fees and other enforcement costs it incurred pursuing its claims based on § 9606(b) that are consistent with the NCP. But Defendants may still challenge the consistency with the NCP of all response costs originating from response actions disclosed after the issuance of the March 2013 order.

For the reasons expressed in section II.C of this Order, the motion to exclude certain issues from trial on remand (Clerk's No. 246) is DENIED IN PART to the extent it seeks a ruling that all response costs incurred by the Government are recoverable as a matter of law in the event that Defendants are not liable as arrangers under § 9607(a). If the Government does not prove at trial that Defendants arranged for the disposal of a hazardous substance within the meaning of § 9607(a), the Court will permit the parties to submit arguments concerning the issues listed at the conclusion of that section of this Order. However, because the issue of whether the response actions taken by the Government are consistent with NCP arises only in the event that the Government succeeds on its arranger liability claim, the Court will not hear the parties on this issue if the Government fails to establish liability exists under § 9607(a).

## IV. CONCLUSION

For the reasons expressed herein, the Court disposes of the pending motions in this case as follows:

1. Defendants' motion for partial summary judgment (Clerk's No. 235) is DENIED with respect to the arranger liability claim.

2. Defendants' motion for partial summary judgment (Clerk's No. 235) is DENIED with respect to the punitive damages claim. The Government may pursue punitive damages on the theory that Dico violated the EPA Order by arranging for the disposal of the PCBs by selling the buildings subject thereto to SIM.

3. Defendants' motion for partial summary judgment (Clerk's No. 236) with respect to attorney fees and other enforcement costs the Government incurred in prosecuting Dico's violation of the EPA Order is DENIED. If the Government proves Defendants are liable as arrangers within the meaning of § 9607(a) on remand, Defendants will be jointly and severally liable for all response costs the Government incurred in this action that are not inconsistent with the NCP, including attorney fees and other enforcement costs it incurred pursuing its claims based on § 9606(b). Alternatively, if the Government does not prove at trial that Defendants arranged for the disposal of a hazardous substance within the meaning of § 9607(a), the Court will permit the parties to submit arguments concerning the following issues: (1) the appropriateness of awarding the Government attorney fees and other enforcement costs incurred in pursuing its successful claim for civil penalties under § 9606(b) in the absence of a successful arranger liability claim; (2) the appropriateness of holding Titan Tire liable for attorney fees and other enforcement costs the Government incurred pursuing its successful claim for civil penalties under § 9606(b) against Dico in the absence of a successful arranger liability claim against all Defendants; and (3) whether and to what degree the successful claim for civil

penalties and the unsuccessful claims for arranger liability and punitive damages were based on a common core of facts and related legal theories such that they were inextricably intertwined.

4. The Government's motion to exclude certain issues from trial on remand (Clerk's No. 246) is GRANTED with respect to the origin issue. The parties are barred from presenting at trial any argument, evidence, opinion, and testimony as to the origin of the PCBs discovered at the SIM site.

5. The motion to exclude certain issues from trial on remand (Clerk's No. 246) in GRANTED IN PART and DENIED IN PART with respect to the issue of whether the Government's response actions were inconsistent with the NCP. The motion is denied to the extent it seeks a ruling that all response costs incurred by the Government are recoverable as a matter of law in the event that Defendants are not liable as arrangers under § 9607(a). The motion is granted with respect to the consistency with the NCP of response costs originating from response actions disclosed prior to the issuance of the March 2013 order. Accordingly, the parties are barred from presenting at trial any argument, evidence, opinion, and testimony for the sole purpose of challenging the consistency with the NCP of response costs originating from response actions disclosed prior to the issuance of the March 2013 order. Defendants may still challenge the consistency with the NCP of all response costs originating from response actions disclosed after the issuance of the March 2013 order.

IT IS SO ORDERED.